**CABAZON BAND OF MISSION INDIANS, and the Sycuan Band of Mission Indians, Plaintiffs,**

v.

**STATE OF CALIFORNIA, et al., Defendants.**

**No. Civ. S–90–1118–DFL.**

United States District Court, E.D. California.

March 31, 1992.

Glenn M. Feldman, O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, P.A., Phoenix, Ariz., for Cabazon Band of Mission Indians.

Barbara E. Karshmer, Inc., George Forman, Gary P. Harrington, Alexander & Karshmer, Berkeley, Cal., for the Sycuan Band of Mission Indians.

Daniel E. Lungren, Atty. Gen., Cathy Christian, Deputy Atty. Gen., Sacramento, Cal., for defendants.

## ORDER

LEVI, District Judge.

The Cabazon and Sycuan Bands of Mission Indians (the "Tribes") seek a determination that the State of California cannot impose license fees on its on-reservation betting facilities for simulcast horse racing. The Tribes argue that the license fees are a direct tax on them that is barred by the Indian Gaming Regulatory Act ("IGRA") and the doctrine of tribal sovereign immunity. California asserts that the license fees are permissible under IGRA because the fees do not constitute a direct tax on the Tribes. Both parties move for summary judgment. The State's motion is granted and the Tribes' motion is denied.

## I

The Indian Gaming Regulatory Act of 1988 ("IGRA"), 25 U.S.C. §§ 2701–2721, authorizes Indian tribes to conduct gaming activities that are permitted in the state in which the tribes' lands are located. The purpose of permitting Indian tribes to run gaming operations is to promote tribal economic development, self-sufficiency, and strong tribal governments. 25 U.S.C. § 2702(1). IGRA classifies gaming into three different categories and permits varying degrees of tribal, state, and federal regulation. Class I gaming, which involves social games for prizes of minimal value, is within the exclusive jurisdiction of the Indian tribes and is not subject to state or federal regulation. 25 U.S.C. §§ 2703(6) and 2710(a). Class II gaming, which includes bingo and some card games, is within the jurisdiction of the tribes, but is also subject to federal regulation. 25 U.S.C. § 2703(7)(A)–(D), § 2710(a)(2). Class III

gaming, which includes all gaming not covered by Classes I & II, is permissible only if it is: (1) authorized by a resolution of the tribe's governing body; (2) approved by the Chairman of the National Indian Gaming Commission; (3) located in a state that permits that type of gaming; and (4) conducted pursuant to a tribal-state compact. 25 U.S.C. § 2710(d)(1). Off-track betting at simulcast wagering facilities is Class III gaming under IGRA. (Stipulated Statement of Facts ("SSF") at ¶ 10.)

Unlike Class I and II gaming, IGRA provides that Class III gaming will be subject to extensive state regulation. The states have a greater interest in regulating the more sophisticated types of gaming covered by Class III because most participants will be non-Indians, and there is a significant risk of infiltration by criminal elements. See 134 Cong.Rec. H8146–01. Because of the importance of the states' interests affected by Class III gaming, and because of the extensive state regulation of Class III gaming, IGRA requires that tribes and states negotiate tribal-state compacts which govern many aspects of the conduct of the gaming.

IGRA contemplates a highly flexible compact negotiation process, in which the states and tribes may agree upon a multitude of issues related to the conduct of Class III gaming. IGRA provides that tribal-state compacts may contain provisions covering, inter alia, questions such as the application of criminal and civil laws related to gaming regulation, allocation of jurisdiction over criminal and civil matters, state taxation to cover costs of regulation, and remedies for breach of contract. See 25 U.S.C. § 2710(d)(3)(C)(i)–(vii).[1]

---

**1.** The Act provides for jurisdiction in the federal district courts to entertain a suit by an Indian tribe when the tribe and the state are unable to negotiate a compact. In such actions, the tribe must introduce evidence that the state did not respond to the tribe's request to negotiate a compact or did not respond in good faith. 25 U.S.C. §§ 2710(d)(7)(A) and (7)(B). Upon the introduction of such evidence, the burden of proof is on the state to prove it negotiated in good faith:

In determining ... whether a State has negotiated in good faith, the court—

(I) may take into account the public interest, public safety, criminality, financial integrity, and adverse economic impacts on existing gaming activities, and

(II) shall consider any demand by the State for direct taxation of the Indian tribe or of any Indian lands as evidence that the State has not negotiated in good faith.

25 U.S.C. § 2710(d)(7)(B)(iii).

In this case, plaintiffs do not argue that the State has acted in bad faith and thus do not invoke 25 U.S.C. § 2710(d)(7)(A) to establish the court's jurisdiction. The court has jurisdiction

## II

California permits horse racing enthusiasts to bet on races both at the track where the races are conducted and at off-site facilities. Off-track betting is conducted at facilities that receive a simultaneous satellite transmission of live races. The off-track facilities are electronically connected to the originating tracks so that the bets placed at the off-track facilities are part of the parimutuel[2] betting pool. (SSF at ¶ 12.) The California Horse Racing Board approves the off-track betting facilities, which are known as "simulcast" or "satellite" wagering facilities. *Id.* Racing associations, composed of the operators of live races, can form organizations to transmit the audio-visual signal and administer the parimutuel betting operations at simulcast facilities. *Id.*

California has an extensive statutory scheme for regulating and taxing horse racing and off-track betting at simulcast satellite wagering facilities. The statutory plan provides for the distribution of all money wagered that is not paid out to bettors. The money is allocated in predetermined percentages to California, simulcast facility operators, racing associations composed of operators of live races, and various other public and private entities. In order to finance the cost of regulation by the state horse racing board and to raise revenues, California requires that between one-and-a-half and four percent of the amount wagered at simulcast facilities be paid to the state as license fees. Cal.Bus. & Prof.Code § 19611. Additional license fees payable to the state are provided for by sections 19606.5 and 19606.6. The racing associations are responsible for paying the license fees to California. Cal.Bus. & Prof.Code §§ 19605.7(i) & 19605.71(d). Any monies left over are paid to the racing associations and the horsemen who participate in the races. Cal.Bus. & Prof.Code §§ 19605.8 & 19606.

## III

The Tribes entered into compacts with California to operate simulcast wagering facilities on their reservations, pursuant to 25 U.S.C. § 2710(d).[3] The compacts have been approved by the Assistant Secretary of the Interior and published in the Federal Register, as required by 25 U.S.C. § 2710(d)(2)(B). (SSF at ¶¶ 21–22.) Both Tribes are presently operating simulcast wagering facilities on their respective reservations under agreements with the racing associations. SSF at ¶ 23.

The Tribes are entitled to keep 2.33% of the total wagers placed at their facilities, pursuant to their compact with California. All off-track facilities retain 2% as a commission, and pay .33% to the local government entity. The tribes keep both the 2% ordinarily payable to the facility operator, and the additional .33% as the local government entity. (SSF at ¶ 24.) Thus, the Tribes receive the same revenue paid to non-Tribe simulcast operators plus the same revenue paid to non-Tribe local governments.

The Cabazon Band's simulcast wagering facility generated nearly $300,000 in license fees for California between March 1, 1990, and February 28, 1991. (SSF at ¶ 25.) The license fees were collected from the racing association that operated the live race, based on the amount wagered at the reservation. The state horse racing board's actual costs in monitoring the Cabazon Band's operation during this period totaled $13,808. (SSF at ¶ 32.) The Cabazon Band itself retained $217,000 during the same period. (SSF at ¶ 26.)

From November 1, 1990 to March 31, 1991, the Sycuan Band's simulcast wagering facility generated over $440,000 in license fees for the State. (SSF at ¶ 27.) Again, the license fees were not collected

of this action under 28 U.S.C. § 1362, which provides for federal court jurisdiction over all civil actions involving Indian tribes.

**2.** In pari-mutuel betting, those who bet on the winner share the total stakes minus a small percent for the management.

**3.** The parties agree that the lands of both Tribes' reservations are "Indian lands" within the meaning of 25 U.S.C. § 2703(4).

directly from the Tribe but from the racing associations, based on the revenues generated by the simulcast facility located on the reservation. The horse racing board's actual costs in monitoring the Sycuan Band's operation during this period totaled $8,895. SSF at ¶ 33. The Sycuan Band itself retained $318,000 during the same period. SSF, ¶ 26.

While negotiating the compacts, the parties disagreed about whether California has jurisdiction to collect its license fee based on revenues generated at the Tribes' simulcast operations. As noted above, such fees are collected by law from the racing associations, based on wagering revenues—including simulcast wagers—generated by the associations' races. *See* Cal.Bus. & Prof.Code §§ 19605.71(a)–(b), 19606.5, and 19606.6. The parties agree that these fees are taxes, even though they are called "license fees." SSF at ¶ 16. The Tribes argue that the license fees are impermissible because they reduce the amount that the Tribes would collect from the simulcast enterprise, and so constitute a direct tax.[4] California asserts that because the license fees are paid by the racing associations, the racing associations are the entities burdened by the tax, not the Tribes. The Tribes and California agreed that the Tribes would seek judicial resolution of this question, which is the sole issue before the court.

## IV

■ The first source of guidance as to whether the license fees are permissible is IGRA itself. The Tribes contend that IGRA's extensive regulatory provisions preempt the State's jurisdiction to tax Indian gaming. IGRA explicitly addresses what type of direct state taxation is permissible. Tribal-state compacts may provide for a State tax on Indian gaming activities to the extent necessary to raise revenues to cover the costs of regulating the gaming. 25 U.S.C. § 2710(d)(3)(C)(iii). The compacts

may also permit the Tribes to tax gaming "in amounts comparable to amounts assessed by the State for comparable activities." 25 U.S.C. § 2710(d)(3)(C)(iv). IGRA also provides that:

> Except for any assessments that may be agreed to [to permit the state to recover its costs of regulation], nothing in this section shall be interpreted as conferring upon a State ... authority to impose any tax, fee, charge, or other assessment upon an Indian tribe ... engag[ing] in a class III activity.

25 U.S.C. § 2710(d)(4). These subsections, read together, constitute a prohibition on direct taxation of revenues generated by tribes, other than that necessary to reimburse the state for the cost of its regulatory activities. This prohibition is echoed by IGRA's instruction that courts shall "consider any demand by the State for *direct* taxation of the Indian tribe ... as evidence that the State has not negotiated in good faith." 25 U.S.C. § 2710(d)(7)(B)(iii)(II) (emphasis added).

However, IGRA consistently speaks only to *direct* taxation. The dispute in the present case is over whether the license fees, which are levied on the racing associations and which affect the Tribes only indirectly, are an impermissible burden on the Tribes. The language of the Act is silent as to the legality of a uniform tax imposed on non-Indian entities who contract with Indian tribes. Congressional silence "no longer entails a broad-based immunity from taxation for private parties doing business with Indian tribes." *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 109 S.Ct. 1698, 1707, 104 L.Ed.2d 209 (1989).

Because the language of the statute does not directly address the issue, it is appropriate to consult the legislative history for guidance. The legislative history of the Act strongly suggests that Congress did not intend to preempt the license fees the

---

**4.** During the course of negotiating the compacts, California and the Tribes agreed that if there is a final judicial determination that the license fees are impermissible under IGRA, all license fees previously collected by California will be

returned to the Tribes. In the future, the Tribes would be entitled to receive "an amount equivalent to the state license fee from all wagers at the [Tribes'] simulcast wagering facility." (Tribal Compacts at ¶ 19(A)(3).)

State seeks to collect from the racing associations. A primary purpose of IGRA was to create an arena in which Indian tribes could compete on an equal footing with non-Indian entities, "to achieve a fair balancing of competitive economic interests." Senate Report No. 100–446 at U.S.Code Cong. & Admin.News 1988, p. 3071. The Act seeks to provide "free market competition" between Indian gambling operations and other State-licensed gaming enterprises. *Id.* at 3083.

In addition, the Act seeks uniformity in the regulation of Indian and non-Indian gaming activities:

> This legislation is intended to provide a means by which tribal and State governments can realize their unique and individual governmental objectives, while at the same time, work together to develop a regulatory and jurisdictional pattern that will foster a consistency and uniformity in the manner in which laws regulating the conduct of gaming activities are applied.

*Id.* at 3076.

Finally, through the compact process, Congress sought to leave to the states and the tribes the authority to adjust their mutual interests in Class III gaming. Congress recognized revenue collection as a legitimate state interest:

> State and Tribal governments have significant governmental interests in the conduct of class III gaming. States and tribes are encouraged to conduct negotiations within the context of the mutual benefits that can flow to and from tribe and States. ... A State's governmental interests with respect to class III gaming on Indian lands include the interplay of such gaming with the State's public policy, safety, law and other interests, as well as impacts on the State's regulatory system, including its economic interest in raising revenue for its citizens.

*Id.* at 3083; *see id.* at 3084 (states may reject Indian gaming if negative economic consequences outweigh benefits). Congress' intent to establish an equal footing for competing tribal and non-Indian gaming enterprises, to provide for uniform regulation, and to permit the States to achieve certain economic goals indicates that, except for direct state taxation, Congress did not intend to preempt the state tax at issue here. California seeks to treat revenue generated by racing associations on Indian lands in precisely the same fashion as revenue generated on non-Indian lands. Such a tax furthers the twin goals of equality and uniformity in regulation. Finally, preemption would deprive the State of substantial revenues traditionally collected from pre-existing racing association activities. Congress intended that the states and tribes would reach some accommodation on this issue through the compact process; it did not intend to bar the State from collecting a generally imposed tax on racing associations for all of their activities whether on Indian or non-Indian lands.

In short, based on the Act's silence as to indirect taxation, and Congress' intent that Class III tribal gaming be treated equally to non-Indian gaming, the court finds that IGRA does not preempt the tax at issue here.

## V

The Tribes argue that even if IGRA does not preempt the State's licensing fees, the tax is still invalid as an impermissible intrusion on the Tribes' sovereignty. The Tribes argue that under general principles of federal Indian law, the tax is preempted. Although the strict prohibition against direct taxation of Indian tribes is well settled, *County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation,* —— U.S. ——, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992), the more difficult area for the federal courts has been taxation of entities and individuals who conduct business with Indian tribes. "[F]ederal preemption is not limited to cases in which Congress has expressly—as compared to impliedly—pre-empted the state activity." *Cotton Petroleum,* 109 S.Ct. at 1707. In order to determine when there is an implied preemption of state regulation or taxation, the courts have developed a balancing test which weighs the conflicting state, federal and tribal interests. *Hoopa Valley Tribe*

*v. Nevins,* 881 F.2d 657, 659 (9th Cir.1989), *cert. denied,* 494 U.S. 1055, 110 S.Ct. 1523, 108 L.Ed.2d 763 (1990) (citing *Cotton Petroleum,* 109 S.Ct. at 1707.) The following factors are relevant to the balancing of these interests to determine if such taxes impermissibly interfere with federal or tribal interests: (1) the economic and administrative burden on the tribe; (2) the extent and cost of state regulation, and state services provided; and (3) the nature of the taxed tribal activity. The court will review each of these factors in turn as it relates to the present dispute.

### VI

■ The fiercest point of disagreement between the Tribes and California is over the economic impact of the license fees on the Tribes. California argues that because the state statutory scheme provides for the distribution of any monies not retained by the off-track betting facilities or paid to the State, the Tribes have no legal right to the license fees even if California is barred from collecting them. If the Tribes as simulcast operators have no entitlement to the fees, there is no economic burden to the Tribes of having a third party, here the racing associations, turn over the fees to California.

In response, the Tribes rely on the State–Tribal compacts, which provide that if the license fees are found to be an impermissible tax, the Tribes will receive fees collected in the past, and will be entitled to collect future license fees. The Tribes argue that because they will be deprived of additional revenue if the license fees are upheld by this court, they are burdened economically by the fees.

The court is not in agreement with the Tribes' circular view of the effect of the State–Tribal compacts. In the compacts, California conceded only that if the court finds the tax invalid, it would pay over to the Tribes any monies collected and would allow the Tribes to retain that revenue in the future. The State plainly did not concede that the tax imposed a burden on the Tribes. The compacts contemplate that the possible invalidity of the tax will be determined by considering factors independent of any settlement agreement the parties may have as to the effect of the court's ruling. Any other approach could lead to inconsistent results, depending on the particular settlement agreement between the State and the Tribe. The only question for the court is whether the license fees burden the Tribes, and not whether a decision adverse to the Tribes could have economic consequences because of a settlement agreement. In evaluating the economic impact of the license fees, the court looks to the state provisions for assigning the right to receive revenues from the off-track facilities, as well as any negative effect on the Tribes' ability to compete with non-Indian facilities.

State law places the duty to pay the license fees on the racing associations.[5] Cal.Bus. & Prof.Code §§ 19605.7(i) & 19605.71(d).[6] If California cannot tax the revenues derived from betting at simulcast facilities located on the Tribes' lands, these revenues would be distributed 50% to the racing associations and 50% as purses to horsemen who participate in the races. Cal.Bus. & Prof.Code §§ 19605.8 & 19606. Because the Tribes do not have the responsibility of paying the taxes, and have no right to the revenues if the taxes were to go unpaid, the license fees do not impose an economic burden on the Tribes.

Furthermore, payment of the license fees does not harm the Tribe's economic interest by making gaming activities more expensive and less attractive to the Tribe's patrons. There is no evidence before this court that payment of the tax reduces the Tribes' ability to market their gaming oper-

---

5. Although the legal incidence of the tax is not dispositive, the Supreme Court has upheld a regulation requiring Indian tribes to collect sales tax where the legal incidence of the tax fell on the purchasers, and not on the tribes. *Moe v. Confederated Salish and Kootenai Tribes,* 425

U.S. 463, 481, 96 S.Ct. 1634, 1645, 48 L.Ed.2d 96 (1976).

6. These sections provide: "Notwithstanding any other provision of law, a racing association is responsible for the payment of the state license fee as required by this section."

ations. *Compare Crow Tribe of Indians v. Montana,* 819 F.2d 895, 899 (9th Cir. 1987), *aff'd,* 484 U.S. 997, 108 S.Ct. 685, 98 L.Ed.2d 638 (1988) (coal tax imposes economic burden on tribe by increasing costs to coal producers and reducing royalties paid to tribe). The license fees do not render betting at the Tribes' operations less profitable for the bettors—indeed, there is no evidence whatsoever that the Tribes's ability to attract customers has been adversely affected by payment of the license fees. In the absence of the license fees, the tribes would not be able to offer bettors a higher payout on their wagers because the amount winners receive is determined by total wagers in the betting pool.

The Supreme Court has also recognized administrative burden as a factor in determining whether Indian tribes can be required to collect taxes when the legal incidence of the tax falls on the consumer of the tribes' product. *Oklahoma Tax Comm'n v. Potawatomi Indian Tribe,* —— U.S. ——, 111 S.Ct. 905, 911, 112 L.Ed.2d 1112 (1991). The prohibition against imposing direct taxes on Indian tribes "does not excuse a tribe from all obligations to assist in the collection of validly imposed state sales taxes." *Id.* In the present case, there is no additional administrative burden placed on the Tribes by collection of the monies ultimately used by the racing associations to pay the license fees. Under state law, the Tribes must turn over to the racing associations all monies received from wagering except for the percentage they are entitled to as simulcast facility operators.

In sum, there is no economic burden placed on the Tribes by the license fees because they do not pay the fees, and the fees do not make their product less attractive, thereby reducing the profitability of the tribal operations. Additionally, there is no administrative burden imposed by the requirement that the Tribes collect the wagers which are later used by the racing associations to pay the license fees. The absence of economic and administrative burdens weighs in favor of finding the license fees a permissible indirect tax on the activities of the Tribes.

## VII

The extent and cost of state regulation as well as the nature of the services provided by California all favor permitting the license fees. California has an extensive state regulatory scheme for off-track betting, expends funds to regulate the taxed activity, and provides services directly related to the taxed activity.

The extent of state regulation is an important factor in determining the state's ability to tax the regulated activity. Where states have attempted to tax tribal activity and have not otherwise regulated the activity, the federal courts have stricken the proposed tax. In *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980), the Court held that where the state does not regulate the taxed activity and has no duties or obligations to the tribes related to the taxed activity, state taxation is preempted. Furthermore, the Court noted in invalidating the tax that it was undisputed that the economic incidence of the tax would ultimately fall on the tribes. Similarly, in *Ramah Navajo Sch. Bd. v. Bureau of Revenue of N.M.,* 458 U.S. 832, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982), the Court refused to permit New Mexico to impose a tax related to school construction on the tribe's reservation:

> Having declined to take any responsibility for the education of these Indian children, the State is precluded from imposing an additional burden on the comprehensive federal scheme intended to provide this education—a scheme which has "left the State with no duties or responsibilities." Nor has the State asserted any specific, legitimate regulatory interest to justify the imposition of its gross receipts tax.

*Id.* at 843, 102 S.Ct. at 3401 (quoting *Warren Trading Post Co. v. Arizona Tax Comm'n,* 380 U.S. 685, 691, 85 S.Ct. 1242, 1246, 14 L.Ed.2d 165 (1965)); *cf. Hoopa Valley,* 881 F.2d at 660 (timber yield tax

impermissible where state has "no role" in regulating sale of tribal timber).

Where there is active state regulation, in contrast, the Supreme Court has permitted taxation of the regulated activity. A severance tax imposed on production of oil and gas by non-Indian lessees of wells on tribal land was upheld in *Cotton Petroleum*, in part because of state involvement in regulating oil and gas production. The Court distinguished *Ramah* and *Bracker*, noting that New Mexico provided extensive services to the tribes related to the oil and gas production, and that no state services had been provided in *Ramah* and *Bracker*. The Court also distinguished those cases because it found that the tax was not an economic burden on the tribe, unlike the taxes in *Ramah* and *Bracker*, which reduced the profitability of the tribes' activities.

The *Cotton Petroleum* Court also rejected the tribe's argument that the tax was impermissible because the value of the state services received by the tribe was considerably less than the revenue the state received from the disputed tax. The Court first noted that it was not possible to accurately value the benefit of the services provided by New Mexico to the tribes because of the intangible benefits of membership in the state community. Second, the Court found "no constitutional requirement that the benefits received from a taxing authority by an ordinary commercial taxpayer—or by those living in the community where the taxpayer is located—must equal the amount of its tax obligations." *Id.* 109 S.Ct. at 1714 (citing *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 491 n. 21, 107 S.Ct. 1232, 1245 n. 21, 94 L.Ed.2d 472 (1987)).

In light of the principles of *Ramah, Bracker,* and *Cotton Petroleum,* the court finds that the extent of the State's regulation of Class III gaming favors upholding the license fees. Unlike *Ramah* and *Bracker,* there is extensive state regulation of horse racing and simulcast off-track betting. The level of the state regulation here far exceeds that in *Cotton Petroleum,* which was apparently limited to regulating

"the spacing and mechanical integrity of wells located on the reservation." 109 S.Ct. at 1712. California has a statutory plan regulating in minute detail the allocation of revenues and expenses associated with horse racing and off-track betting.

Furthermore, the fact that the cost to California of regulating the off-track betting facilities may be less than the revenues it derives from the license fees does not invalidate the fees. As in *Cotton Petroleum,* the revenues here far exceed the itemized costs of regulation. Additionally, as in *Cotton Petroleum* there are many costs borne by the State that are of a general nature and which cannot be assigned to any particular gambling operation. The presence of horse racing in California requires the State to support additional law enforcement and tax collection bureaucracies as well as establishing and operating the extensive administration that oversees the horse racing industry. Even if the state revenues were disproportionately larger than state expenses, the lack of proportionality does not make the tax an impermissible burden on the tribes. *See Cotton Petroleum,* 109 S.Ct. at 1714.

## VIII

When the nature of the activity that a state seeks to tax is unrelated to traditional Indian activity and consists of taking advantage of an exemption not available to non-Indians, an indirect tax will be upheld. In *Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), the Court upheld a tax on cigarettes sold on Indian lands to non-Indians. In evaluating the legitimacy of the tax, the Court examined the source of the value being marketed by the tribes:

> It is painfully apparent that the value marketed by the smokeshops to person coming from outside is not generated on the reservations by activities in which the Tribes have a significant interest. What the smokeshops offer these customers, and what is not available elsewhere, is solely an exemption from state taxation.

*Id.* at 155, 100 S.Ct. at 2082. Because the value was not generated by the tribes, the Court found that the tribes' interest in raising revenue was weak. The tribal interest "is strongest when the revenues are derived from value generated on the reservation by activities involving the Tribes and when the taxpayer is the recipient of tribal services." *Id.* at 156–57, 100 S.Ct. at 2083.

The tribal interest in raising revenue is stronger where the value being marketed is gaming, as in the present case, than it is where the tribes are seeking to take advantage of a tax exemption, as in *Colville.* Gaming is a major source of employment on Indian reservations, and tribes make large investments in building and maintaining gaming facilities. *See California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987). In *Cabazon,* the Supreme Court distinguished *Colville,* noting the extent of the tribes' efforts to attract customers to their gaming facilities:

> The Tribes are not merely importing a product onto the reservations for immediate resale to non-Indians. They have built modern facilities which provide recreational opportunities and ancillary services to their patrons, who do not simply drive onto the reservations, make purchases and depart, but spend extended periods of time there enjoying the services the Tribes provide.

*Cabazon,* 480 U.S. at 219, 107 S.Ct. at 1093.

Applying the principles of *Colville* and *Cabazon* to the present case, the court finds that the nature of the value being marketed is a neutral factor. Although the Tribes here, as in *Cabazon,* have an extensive commitment to operation of their gaming operations, this case is different because it involves simulcast horse racing, not the card games and bingo at issue in *Cabazon.* Plainly card games and bingo conducted in buildings constructed on Indian land offer a value generated on the reservation. However, the value of pari-mutuel betting on simulcast horse racing is derived largely from an activity—live horse racing—occurring outside the reservation and operated by non-Indian racing associations. Because the betting occurs on Indian land, but is dependent on events occurring elsewhere, this factor is neutral in balancing tribal, state, and federal interests.

## IX

The court holds that the license fees California collects from the horse racing associations which broadcast their races to on-reservation betting operations are neither preempted by IGRA nor a violation of the Tribes' sovereign immunity. Although IGRA addresses the permissibility of direct taxes, there is no explicit preemption of the indirect tax imposed by the license fees. IGRA's legislative history suggests that Congress did not intend to preempt the indirect tax at issue here. In evaluating whether Congress has impliedly preempted the license fees through the sovereign immunity accorded to the Tribes, the court has balanced the strength of the federal, tribal and state interests involved in Class III gaming operations in California. Because the taxes are collected from the horse racing associations and do not reduce the profitability of the tribal gaming operations, there is no economic burden on the Tribes. California is an active participant in regulating horse racing and off-track betting, and has not abandoned this area to the federal government or the tribes. Finally, the nature of the off-track betting is a mix of on-reservation and off-reservation activity. After weighing these factors, the court holds that California may tax the racing associations by imposing license fees on all the revenue generated by simulcast wagering, including wagering at the Tribes' on-reservation simulcast facilities.

The Clerk of the Court is directed to enter judgment in favor of the State of California.

IT IS SO ORDERED.