CABAZON BAND OF MISSION INDI-ANS, a federally recognized Indian Tribe; Sycuan Band of Mission Indians, Plaintiffs–Appellants,

v.

Pete WILSON, Governor, et al., Defendants–Appellees.

No. 92–15751.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 5, 1993.

Opinion Filed May 9, 1994.

Opinion Withdrawn Oct. 6, 1994.

Decided Oct. 6, 1994.

George Forman, Alexander & Karshmer, Berkeley, CA, and Glenn M. Feldman, O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, Phoenix, AZ, for plaintiffs-appellants.

Cathy Christian, Supervising Deputy Atty. Gen., Sacramento, CA, for defendants-appellees.

Before: BOOCHEVER, THOMPSON, and O'SCANNLAIN, Circuit Judges.

## ORDER

The petition for rehearing is GRANTED.

The opinion filed on May 9, 1994 is hereby WITHDRAWN and the attached opinion shall be filed in lieu thereof.

## OPINION

O'SCANNLAIN, Circuit Judge:

We consider the power of the State of California to tax offtrack betting activities on Indian reservations.

### I

Plaintiffs Cabazon Band of Mission Indians and Sycuan Band of Mission Indians ("the Bands") conduct simulcast wagering (offtrack betting) on their reservations to raise tribal revenue. Such activities are regulated by the federal Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701–2721, which categorizes Indian gaming into three classes; simulcast wagering is Class III gaming. Under IGRA, states and Indian tribes must negotiate compacts to regulate the terms under which Class III gaming may be conducted. Here, California and the Bands entered into compacts for the Bands to operate their simulcast wagering facilities.

Southern California Off Track Wagering, Inc. ("SCOTWINC") is a quasi-governmental organization of racing associations formed under California law. Cal.Bus. & Prof.Code § 19608.2. Both Bands entered written agreements with SCOTWINC and the racing associations which conduct the live horse races. SCOTWINC arranges for the racing associations' broadcast signals to be transmitted to the Bands' on-reservation simulcast wagering facilities. SCOTWINC also accepts the wagers and handles the cash at the Bands' facilities.

Under the terms of the compacts between California and the Bands, SCOTWINC distributes to the Bands 2.33% of the money wagered at their simulcast wagering facilities. Two percent is the typical commission offered by racing associations for operating a satellite wagering facility; the remaining 0.33% is paid to the Bands in their deemed "local government" capacity. The Bands contend that an additional amount should be distributed to them rather than remitted to the State of California measured by the proportion of license fees payable on wagers placed at their facilities.

SCOTWINC remits to the State the license fee imposed under Cal.Bus. & Prof. Code sections 19605.71(a) and (b), 19606.5 and 19606.6, which is a percentage of all wagers placed. Different percentages are paid based on the location of the wager (ontrack or offtrack), the type of wager (conventional or exotic), and the type of race (breed of horse and distance). Part of this license fee is based on wagers placed at Indian wagering facilities. California concedes that the license fee is a tax. The Bands assert that part of the license fee based on wagers placed at Indian facilities is a tax prohibited under both IGRA and traditional grounds of federal preemption, and should be payable instead to the Bands.

Because the State of California and the Bands could not agree whether the State had the power to collect the license fee based on wagers at Indian facilities, the negotiated compacts specifically state that the Bands will sue the State for declaratory relief. After the Bands brought suit, both sides moved for summary judgment, which the district court granted for the State. *See Cabazon Band of Mission Indians v. California,* 788 F.Supp. 1513 (E.D.Cal.1992). The Bands timely appealed.

### II

■ The Bands first contend that the State's license fee is impermissible, under IGRA. The Bands argue that IGRA expressly prohibits the taxation of both Indian Bands and those entities authorized by such Bands to engage in Class III gaming activities. In support of their contention, the Bands point to section 2710(d)(4) of IGRA, which provides that "nothing in this section shall be interpreted as conferring upon a State ... authority to impose any tax, fee, charge, or other assessment upon an Indian

tribe or upon any other person or entity authorized by an Indian tribe to engage in a class III activity." 25 U.S.C. § 2710(d)(4).

The Band's reasoning is flawed because it equates the failure to confer authority to tax with a prohibition to tax. We objected to this kind of statutory construction in *Catholic Social Services, Inc. v. Thornburgh*, 956 F.2d 914, 923 (9th Cir.1992), *vacated on other grounds*, —— U.S. ——, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993). In that case, the plaintiffs sought an injunction requiring the admission of aliens into the United States. Opposing the injunction, the government cited 8 U.S.C. § 1255(a)(3)(C), which states "[n]othing in this section shall be construed as authorizing" petitioners' admission into the country. Although we affirmed the district court's denial of the injunction, we explicitly stated that the statute did not provide a basis for our affirmance because, "although the statute does not authorize admission to the United States, it does not prohibit admission either." *Catholic Social Servs., Inc.*, 956 F.2d at 923.

Similarly, section 2710(d)(4) is not on its face a prohibition of state taxation. The absence of an express prohibition on the State's power to tax does not end our inquiry, however.

### III

The Supreme Court has, as a matter of federal Indian law, explicitly "rejected the proposition that in order to find a particular state law to have been preempted by operation of federal law, an express congressional statement to that effect is required." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 144, 100 S.Ct. 2578, 2584, 65 L.Ed.2d 665 (1980). Thus, we must analyze whether Congress has, by implication, acted to preempt the extension of state authority onto Indian reservations in this instance.

■ In determining whether federal law preempts a state's authority to regulate activities on tribal lands, courts must apply standards different from those applied in other areas of federal preemption. "State jurisdiction is pre-empted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority." *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 334, 103 S.Ct. 2378, 2386, 76 L.Ed.2d 611 (1983). In balancing these federal, tribal, and state interests, no specific congressional intent to preempt state activity is required; " 'it is enough that the state law conflicts with the purpose or operation of a federal statute,. regulation, or policy.' " *Crow Tribe of Indians v. Montana*, 819 F.2d 895, 898 (9th Cir. 1987), *aff'd*, 484 U.S. 997, 108 S.Ct. 685, 98 L.Ed.2d 638 (1988) (quotation omitted). Furthermore, "ambiguities in federal law are, as a rule, resolved in favor of tribal independence." *Cotton Petroleum v. New Mexico*, 490 U.S. 163, 177, 109 S.Ct. 1698, 1708, 104 L.Ed.2d 209 (1989).

We analyze the federal, tribal, and state interests in turn.

### A

■ The federal interests before us are clearly set forth in the language of IGRA itself. Intended to "promot[e] tribal economic development, self-sufficiency, and strong tribal governments," IGRA seeks to "ensure that the Indian tribe is the *primary beneficiary* of the gaming operation." 25 U.S.C. §§ 2701(1) and (2) (emphasis added).

The State's current licensing fee threatens this federal objective. Between March 1, 1990 and February 28, 1991, the State collected $292,075 in license fees from wagers handled at the Cabazon Band's simulcast wagering facility. During that same period, the Cabazon Band earned $217,386. Similarly, between November 1, 1990 and March 3, 1991, $440,175 in license fees were deducted and distributed by SCOTWINC to the State from wagers placed at the Sycuan Band's facility. The Sycuan Band received only $318,743. In both cases, the State benefited from the tribal gaming operation to a considerably greater extent than the Bands. Neither Band would be described as a "primary beneficiary." Such an outcome contravenes the purposes of IGRA. *See White Mountain Apache Tribe*, 448 U.S. at 149, 100 S.Ct. at 2586–87 (concluding that state was preempt-

434

ed from imposing fuel tax on a non-Indian logging company harvesting timber on tribal land because "the taxes would threaten the overriding federal objective of guaranteeing Indians that they 'will receive ... the benefit of whatever profit [the forest] is capable of yielding.' ").

## B

■ The State's licensing scheme also undermines tribal interests. We agree with the district court that the license fee imposed falls directly upon the racing association, and not the Bands.[1] To say that the fee is a direct tax only upon the racing associations is not to say that the Bands are not economically burdened by such fee, however. Discussing federal Indian preemption, the Supreme Court in *Ramah Navajo School Board v. Bureau of Revenue of New Mexico,* 458 U.S. 832, 844 n. 8, 102 S.Ct. 3394, 3401 n. 8, 73 L.Ed.2d 1174 (1982), declined to adopt a "legal incidence test," under which "the legal incidence and not the actual burden of the tax would control preemption inquiry." The Court instead focused on the fact "that the economic burden of the asserted taxes would ultimately fall on the Tribe," even though the legal incidence of the tax was on the non-Indian logging company. *Id.*

Here, as in *Ramah Navajo,* the Bands bear the actual burden of the license fee. The district court reached a conclusion opposite from our own, reasoning that under California law, surplus revenue is to be divided equally between the racing association and the horsemen. Cal.Bus. & Prof.Code §§ 19605.8 & 19606. Thus, the district court concluded, if the racing association did not pay that part of the license fee based on wagers at Indian satellite facilities, the Bands would not be entitled to the money saved. As the court explained, "[b]ecause the Tribes do not have the responsibility of

paying the taxes, and have no right to the revenues if the taxes were to go unpaid, the license fees do not impose an economic burden on the Tribes." *Cabazon Band,* 788 F.Supp. at 1518.

■ State law does not govern this case, however. Rather, the terms of the compact control. S.Rep. No. 446, 100th Cong.2d Sess., *reprinted in* 1988 U.S.C.C.A.N. 3071, 3075–76 ("[U]nless a tribe affirmatively elects to have State laws and State jurisdiction extend to tribal lands, the Congress will not unilaterally impose or allow State jurisdiction on Indian lands for the regulation of Indian gaming activities."). Under the Cabazon and Sycuan Compacts, if the Bands prevail in this litigation, the State is required to pay them the amount of the license fee that the State receives from the racing associations based on wagers at Indian facilities. If the Bands lose, however, they will be deprived of this amount, which will go to the State. Contrary to the conclusion of the district court, the Bands do indeed have a "right" to the unpaid fees. The licensing scheme currently imposed thus constitutes an economic burden.

■ In assessing the Bands' interests, we also must consider the nature of the taxed activity. *Cf. California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 219–20, 107 S.Ct. 1083, 1093–94, 94 L.Ed.2d 244 (1987) (state regulation of on-reservation bingo games preempted because tribe was generating value on reservation); *Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 155, 100 S.Ct. 2069, 2082, 65 L.Ed.2d 10 (1980) (upholding state tax on on-reservation sales of cigarettes to non-Indians because value of transaction was "not generated on the reservations by activities in which the Tribes have a significant interest"). "That a tribe plays an active role in generating activities of value on its reservation gives it a strong interest in main-

1. Despite the Bands' assertions to the contrary, we conclude that the Bands are not directly burdened by the tax before us. The Bands do not pay any of their commission to the State, do not write a check to the State, and do not have any direct contact with the State with respect to the license fee. The Bands' argument that the tax is imposed directly on the Bands because California law imposes different percentage li-

cense fees for wagers made at satellite wagering facilities is not persuasive. *See* Cal.Bus. & Prof. Code §§ 19605.3, 19605.71, 19610. The statutes the Bands cite also establish different tax rates for different breeds of horses and distances. Cal. Bus. & Prof.Code § 19605.71. This, of course, does not mean that the breed of horse pays a direct tax. Place of wager and breed of horse are simply variables in the tax formula.

taining those activities free from state interference." *Gila River Indian Community v. Waddell,* 967 F.2d 1404, 1410 (9th Cir.1992).

Although recognizing the Bands' "commitment to operation of their gaming operations," the district court found that the value of the Bands' activity was derived from live horse racing, an activity "occurring outside the reservation and operated by non-Indian racing associations." *Cabazon Band,* 788 F.Supp. at 1521. Consequently, the court concluded, "[b]ecause the betting occurs on Indian land, but is dependent on events occurring elsewhere, this factor is neutral in balancing tribal, state, and federal interests." *Id.*

The district court has mischaracterized the Bands' interest, in our view. In this instance, the Bands have invested significant funds and effort to construct and to operate wagering facilities and to attract patrons. It is not necessary, as the district court appears to posit, that the entire value of the on-reservation activity come from within the reservation's borders. It is sufficient that the Bands have made a substantial investment in the gaming operations and are not merely serving as a conduit for the products of others. *Cabazon,* 480 U.S. at 219, 107 S.Ct. at 1093 ("Here ... the Tribes are not merely importing a product onto the reservations for immediate resale to non-Indians.").

### C

In contrast to the federal and tribal interests articulated above, the State's interests are weaker, although certainly not trivial. As the district court recognized, the State of California has an extensive regulatory scheme for offtrack betting and expends funds to regulate this activity. Thus, "[t]his is not a case in which the State has nothing to do with the on-reservation activity, save tax it." *Cotton Petroleum,* 490 U.S. at 186, 109 S.Ct. at 1713.

The State's asserted interest is weakened in this case, however, because IGRA specifically recognizes such state regulation and

establishes a mechanism—the compacts—by which Bands can reimburse the State for regulatory costs, outside of the State tax structure. Indeed, the Cabazon and Sycuan Compacts expressly provide for the modification of the compacts to allow for such reimbursement in the event that the Bands prevail in this action. Thus, the State's interest can be satisfied without imposition of the license fee.

Furthermore, this court has required that the State demonstrate a close relationship between the tax imposed on the on-reservation activity and the state interest asserted to justify such tax. *See Crow Tribe,* 819 F.2d at 901 (concluding that a state tax was not narrowly tailored to serve state interest of paying for government services associated with production of coal because 19 to 30% of the tax went to the state general fund). Here, there is no narrow tailoring since California does not use the license fee revenues to fund services related to the regulation of offtrack betting. Rather, 100% of the license fee earned from Indian wagering goes into the State General Fund. This suggests a "distant, rather than a carefully tailored, relationship" between the license fee revenue and the regulatory services provided thereunder.[2] *Id.*

The express objectives of IGRA, when combined with the Bands' interests, preclude the application of the State's license fee.

### IV

We conclude that IGRA preempts the State of California from taxing offtrack betting activities on tribal lands. Accordingly, the district court's grant of summary judgment is reversed and remanded with instructions to enter summary judgment for the Bands.

**REVERSED and REMANDED** with instructions.

---

2. Congress specifically recognized the raising of revenue as a legitimate state interest with respect to Class III gaming. *See* S.Rep. No. 446, 100th Cong.2d Sess., *reprinted in* 1988 U.S.C.C.A.N.

3071, 3083. This interest must be informed by the congressional intent that the Bands be the primary beneficiaries of such gaming, however.