124 F.3d 1050
 39 Fed.R.Serv.3d 276, 97 Cal. Daily Op. Serv. 7065,
97 Daily Journal D.A.R. 11,412
 CABAZON BAND OF MISSION INDIANS, a federally recognized
Indian Tribe; Sycuan Band of Mission Indians,
Plaintiffs-Appellees,
Barona Band of Mission Indians, a federally-recognized
Indian tribe a/k/a Barona Group of Capitan Grande
Band of Mission Indians,
Plaintiff-Intervenor-Appellee,
Viejas Band of Mission Indians, Intervenor-Appellee,
v.
Pete WILSON, Governor of the State of California; State of
California; California Horse Racing Board,
Defendants-Appellants.
Southern California Off-Track Wagering, Inc.; Del Mar
Thoroughbred Club; Hollywood Park, Inc.; Los Angeles Turf
Club; Oak Tree Racing Association; Los Angeles County
Fair; Los Alamitos Race Course, Applicants in
Intervention-Appellants.
 Nos. 96-16432, 96-16443.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 16, 1997.
Decided Sept. 2, 1997.
 
 Manuel M. Medeiros, Supervising Deputy Attorney General, Sacramento, CA, for defendants-appellants.
 Glen M. Feldman, O'Connor, Cavanaugh, Anderson, Westover, Killingsworth & Beshears, Phoenix, AZ, for plaintiffs-appellees the Cabazon Band of Mission Indians.
 George Forman, Forman & Prochaska, San Rafael, CA, for plaintiffs-appellees the Sycuan Band of Mission Indians.
 John Winkelman, Alpine, CA, for plaintiffs-intervenors-appellees the Viejas Band of Mission Indians.
 Art Bunce, Escondido, CA, for plaintiffs-intervenors-appellees the Barona Band of Mission Indians.
 Cathy Christian, Nielsen, Merksamer, Parrinello, Mueller & Naylor, Sacramento, CA, for applicants in intervention-appellants.
 Appeals from the United States District Court for the Eastern District of California; David F. Levi, District Judge, Presiding. D.C. No. CV-90-01118-DFL.
 Before: WIGGINS, JOHN T. NOONAN, JR., and TROTT, Circuit Judges.
 TROTT, Circuit Judge:
 
 I. Overview
 
 1
 The plaintiffs in this case are four bands of Indians-the Cabazon Band of Mission Indians, the Sycuan Band of Mission Indians, the Barona Band of Mission Indians, and the Viejas Band of Mission Indians (collectively, the "Bands")-who operate simulcast wagering facilities on their tribal lands. In this suit, the Bands seek to force the defendants-Governor Pete Wilson, the California Horse Racing Board, and the State of California (collectively, the "State")-to turn over to the Bands license fees which the State collects from California's horse racing associations based on the revenues generated at the Bands' facilities.
 
 
 2
 The action arises out of Tribal-State Compacts into which the parties entered pursuant to the Indian Gaming Regulatory Act of 1988 ("IGRA"), 25 U.S.C. §§ 2701-2721. In those Compacts, the parties agreed to submit to the district court the question of whether the license fees are permissible under IGRA. Because the State agreed to turn over the fees to the Bands if the fees are impermissible under IGRA, and because we held in a prior decision that the fees are impermissible, we affirm the district court's decision ordering the State to turn over the fees.
 
 
 3
 Also before us is the appeal by Southern California Off-Track Wagering, Inc. ("SCOTWINC") and six racing parks (collectively, the "Applicants") from the district court's denial of their motion to intervene as defendants. Because the Applicants waited until after the district court had resolved the vast majority of the case and until only the motion for reconsideration remained, we affirm the district court's denial of intervention.
 
 II. Background
 
 4
 Despite its long and convoluted history, this case begins and ends with four Tribal-State Compacts, entered into by the State and each Band pursuant to IGRA. These Compacts govern the Bands' operation of simulcast wagering facilities and the State's collection of fees from that activity. In these Compacts, the State agreed to pay over to the Bands the amounts of past and future license fees it collected from the racing associations, if a federal district court declared the fees impermissible under IGRA. In a prior decision, we declared them impermissible. Cabazon Band of Mission Indians v. Wilson, 37 F.3d 430 (9th Cir.1994) (hereinafter, "Cabazon II "). We now hold the State to the terms of the Compacts to which it agreed.
 
 A.
 
 5
 The initial story is set forth in the district court's decision in Cabazon Band of Mission Indians v. State of California, 788 F.Supp. 1513 (E.D.Cal.1992) (hereinafter, "Cabazon I "), and in our decision in Cabazon II. We will review only the necessary facts. IGRA authorizes Indian tribes to conduct certain gaming operations on tribal lands and establishes three classes of gaming operations. Off-track betting on horse racing at simulcast facilities is classified as class III gaming under IGRA and is permissible only if: (1) it is authorized by the governing body of the Indian tribe, (2) it is located in a State that permits such gaming, and (3) it is conducted in conformance with a Tribal-State compact. 25 U.S.C. § 2710(d)(1).
 
 
 6
 California permits such off-track wagering, having established an extensive state regulatory scheme to dictate how the money wagered on these races is distributed. See Cal. Bus. & Prof.Code §§ 19605-19611. The statutory plan provides for distribution of all wagers in predetermined percentages to various entities, including the State, the simulcast facility operators (here, the Bands), and the racing associations. See id. § 19605.71. After the bettors receive their winnings and these statutory distributions are made, the remaining funds are divided equally between the horsemen and the racing associations. See id. §§ 19605.8, 19606. Under California's regulations, the racing associations pay license fees to the State in the amount of 1.5% to 4.0% of the revenue generated at the off-track facility. See id. §§ 19611, 19606.5, 19606.6, 19605.7(i), 19605.71(d).
 
 
 7
 In 1990 and 1991, the four Bands and the State entered into compacts pursuant to IGRA allowing the Bands to operate off-track wagering facilities on their lands. The Compacts set out the distribution of the wagers, mirroring the distributions set forth in the State's regulatory scheme. The Bands and the State, however, could not agree whether California has jurisdiction to collect license fees based on revenues generated at the Bands' simulcast facilities. In the Cabazon and Sycuan Compacts, those Bands and the State therefore agreed to submit the issue to a federal district court for resolution. They also agreed that if the fees were impermissible, the State would pay the past and future fees it collected over to the Bands, and if the fees were permissible, the State would retain and continue to collect the fees. These terms were set out in Paragraph 19 of the Cabazon Compact[1] as follows:
 
 
 8
 (B) State License Fee.
 
 
 9
 1. Cabazon shall seek a declaratory judgment against the State from a United States District Court of competent jurisdiction as to whether the deduction and distribution of the state license fee under Business and Professions Code Section 19596.6, subdivisions (d)(1), (d)(2), (k), and (l ), are permissible under the Act [, IGRA].
 
 
 10
 2. In the event a final judgment is obtained that the deduction and distribution of the state license fee is permissible under the Act, and following the exhaustion of all appellate review, the State shall retain all license fees previously distributed to it, and shall be entitled to collect the state license fee from all wagers at the Cabazon simulcast wagering facility....
 
 
 11
 3. In the event a final judgment is obtained that the deduction of the state license fee is impermissible under the Act, and following the exhaustion of all appellate review, the State shall pay over to Cabazon the amount of all state license fees previously distributed to the State under this Compact exclusive of assessments due and owing under subparagraph 4, below, and Cabazon shall thereafter be entitled to receive an amount equivalent to the state license fee from all wagers at the Cabazon simulcast wagering facility. The amount of state license fees previously distributed to the state and not reasonably claimed by the State as due and owing from the commencement of operation of the facility shall be paid over to Cabazon as soon as practicable and in any event, not later than sixty (60) days following final judgment.
 
 
 12
 (Emphasis added.) The Barona and Viejas Bands similarly disagreed with the State about the license fees; in their Compacts, these Bands and the State agreed to be bound by the result in the Cabazon and Sycuan litigation.
 
 
 13
 Pursuant to the Compacts, the Cabazon and Sycuan Bands brought suit in the district court, seeking a declaratory judgment. The district court held that the collection of license fees was permissible under IGRA because the fees did not constitute either a direct tax or an impermissible indirect tax on the Bands. Cabazon I, 788 F.Supp. 1513. We reversed. Cabazon II, 37 F.3d 430. We held that "IGRA preempts the State of California from taxing offtrack betting activities on tribal lands." Id. at 435. Analyzing "whether Congress has, by implication, acted to preempt the extension of state authority onto Indian reservations in this instance," id. at 433, we considered federal, tribal, and state interests in the extension of the State's licensing scheme to tribal gaming. Central to our analysis was our conclusion that, under the terms of the Compacts which govern this case, the Bands have a "right" to the unpaid license fees. We remanded to the district court with instructions to enter summary judgment in favor of the Cabazon and Sycuan Bands. Our decision in Cabazon II is central to the resolution of the instant dispute, and it limits the task before us.
 
 B.
 
 14
 After Cabazon II, the litigation entered, in the words of the district court, "a new and confusing stage." The State refused to pay the fees to the Bands, declared the Compacts invalid, and threatened to cut off the simulcast signal unless the Bands agreed to enter into negotiations for new compacts. In response, the Cabazon and Sycuan Bands moved for an injunction to prevent the cessation of the signal. Invoking 28 U.S.C. § 2202, those Bands also sought enforcement of the Compact provisions requiring the State to pay past and future fees. The Barona and Viejas Bands moved to intervene as plaintiffs. The State opposed enforcement of Paragraph 19(B)(3), arguing: (1) the district court lacked subject matter jurisdiction to enforce the Compacts; (2) the State was immune under the Eleventh Amendment from the Bands' attempt to enforce the Compacts; (3) our Cabazon II decision, holding that the fee was not a tax but was nonetheless impermissible, was so unexpected that it invalidated the Compacts; and (4) the Bands breached the Compacts by operating illegal gaming operations.
 
 
 15
 Concluding that it had subject matter jurisdiction under IGRA to enforce the Compacts and that the State had waived its Eleventh Amendment immunity in the Compacts, the district court considered whether a § 2202 motion was the appropriate procedural vehicle to resolve the remaining issues. The district court first determined that it could resolve the State's claim that our decision was so unexpected as to invalidate the Compacts. The State sought to introduce the negotiating history of the Compacts to show that the parties did not foresee a decision that found the fee to be impermissible but not to be a tax on the Bands. On July 12, 1995, the district court rejected this effort to introduce extrinsic evidence as to the intent of the parties, concluding that "the Compacts placed the legality of the licensing fee before the Court of Appeals without restriction and provided for the possibility that the fee would be declared invalid." 7/12/95 order at 15. The district court then concluded that it could not consider the Bands' claims that the State was in breach of the Compacts and, accordingly, ordered the Bands to amend their complaints to seek relief for breach of the Compacts under IGRA. The district court stated that it would enter a preliminary injunction once the Bands filed their amended complaints. Finally, the district court granted the Barona and Viejas Bands' motion to intervene.
 
 
 16
 The Bands then filed an amended complaint, seeking a declaration of the rights and obligations of the parties under Paragraph 19(B)(3) of the Compacts and the enforcement of the Compacts. In its answer, the State asserted, as affirmative defenses and counterclaims, that: (1) it was immune under the Eleventh Amendment; (2) the Bands violated IGRA by operating illegal slot machines, thus breaching the Compacts and excusing the State's performance; (3) the Bands failed to join indispensable parties-the racing associations; (4) the Compacts are invalid because the State never promised to pay license fees to the Bands if the court determined those fees fell on the racing association rather than the Bands; and (5) the Compacts are invalid under IGRA because the Bands are not the primary beneficiaries. On April 26, 1996, the district court rejected the State's contentions, granted the Bands' motion to strike the affirmative defenses, dismissed the counterclaims, and ordered the State to report within fourteen days how it would comply with the Compacts.
 
 
 17
 At this point in the litigation, SCOTWINC and six racing associations moved for leave to intervene as defendants in this action. The district court denied the motion as untimely. SCOTWINC and the tracks appeal the denial of intervention.
 
 
 18
 The State then moved to reconsider. On July 19, 1996, the district court denied the motion for reconsideration and granted summary judgment in favor of the Bands. The court ordered the State to pay over to the Bands the license fees from pari-mutuel offtrack wagering at the Bands' simulcast facilities. The State appeals this order of the district court.
 
 III. Jurisdiction
 
 19
 Initially, we must determine whether the district court had subject matter jurisdiction over the Bands' action to enforce the Compacts and to require the State to pay over to the Bands the license fees. The State contends that the court lacked jurisdiction, arguing that the Compact provision at issue-Paragraph 19-is merely a contractual agreement incorporated into the Tribal-State Compacts. The dispute, they reason, is purely contractual in nature and therefore beyond the jurisdiction of the federal courts. Although it is true that the federal courts do not have jurisdiction over run-of-the-mill contract claims brought by Indian tribes, see Gila River Indian Community v. Henningson, Durham & Richardson, 626 F.2d 708 (9th Cir.1980), this claim is not based on a contract that stands independent of the Compacts. Rather, it is based on an agreement contained within the Compacts and entered into by the parties, during their IGRA negotiations, in order to resolve a disputed question and to complete the Compacts. The State's obligation to the Bands thus originates in the Compacts. The Compacts quite clearly are a creation of federal law; moreover, IGRA prescribes the permissible scope of the Compacts. We conclude that the Bands' claim to enforce the Compacts arises under federal law and thus that we have jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1362.
 
 
 20
 The State argues that IGRA confers federal jurisdiction over only the three causes of action specified in 25 U.S.C. § 2710(d)(7)(A)(i)-(iii): (1) an action arising from the failure of the state to enter into negotiations or conduct negotiations in good faith; (2) an action to enjoin class III gaming activity on Indian lands that is conducted in violation of a compact; and (3) an action to enforce mediation procedures in the event a compact cannot be reached. We believe that the State construes both federal question jurisdiction and IGRA too narrowly and underestimates the federal interest at stake. In Merrell Dow Pharmaceuticals Inc. v. Thompson, 478 U.S. 804, 814 n. 12, 106 S.Ct. 3229, 3235, 92 L.Ed.2d 650 (1986), the Supreme Court recognized that "[s]everal commentators have suggested that our § 1331 decisions can best be understood as an evaluation of the nature of the federal interest at stake." The Court noted "the importance of the federal issue in federal-question jurisdiction". The district court recognized the federal interest at stake here and the importance of the enforcement of Tribal-State compacts in the federal courts:
 
 
 21
 It would be extraordinary were the statute to provide jurisdiction to entertain a suit to force the State to negotiate a compact yet provide no avenue of relief were the State to defy or repudiate that very compact. Such a gap in jurisdiction would reduce the elaborate structure of IGRA to a virtual nullity since a state could agree to anything knowing that it was free to ignore the compact once entered into. IGRA is not so vacuous.
 
 
 22
 7/12/95 order at 8. We agree that Congress, in passing IGRA, did not create a mechanism whereby states can make empty promises to Indian tribes during good-faith negotiations of Tribal-State compacts, knowing that they may repudiate them with immunity whenever it serves their purpose. IGRA necessarily confers jurisdiction onto federal courts to enforce Tribal-State compacts and the agreements contained therein.
 
 
 23
 Our conclusion is bolstered by IGRA's express authorization of a compact to provide remedies for breach of contract. 25 U.S.C. § 2710(d)(3)(C)(v). This provision invites the tribe and the state to waive their respective immunities and consent to suit in federal court. By envisioning the enforcement of a compact and any contractual obligations assumed pursuant to a compact in federal court, IGRA necessarily confers jurisdiction to the federal courts.
 
 
 24
 An alternative ground for jurisdiction exists. We held in Cabazon II that federal law preempts the State from collecting the taxes. The Bands sue to recover money taken by the State in violation of federal law. The Bands's cause of action arises under the laws of the United States. Jurisdiction exists under 28 U.S.C. § 1362; see Forest County Potawatomi Comm. of Wis. v. Norquist, 45 F.3d 1079, 1082 (7th Cir.1995).[2]
 
 
 25
 Thus, the Bands' action seeking to enforce the Tribal-State Compacts clearly and necessarily arises under IGRA, and we have jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1362.
 
 IV. Enforcement of the Compacts
 
 26
 The State presents four major arguments as to why we should not enforce Paragraph 19(B)(3): (1) the State is immune from suit under the Eleventh Amendment; (2) the State never agreed to surrender the license fees it collected from the racing industry to the Bands unless the court determined that they were an impermissible tax on the Bands; (3) the Compacts are invalid because the racing associations and the horsemen, not the Bands, are the primary beneficiaries; and (4) the Bands materially breached the Compacts by operating illegal slot machines, thereby rendering the Compacts unenforceable against the State. Each of these arguments is unavailing.
 
 A. Eleventh Amendment Immunity
 
 27
 The State contends that it is immune from the Bands' action to enforce the Paragraph 19 obligation. The Eleventh Amendment bars Indian tribes from suing state governments in federal court without their consent. Blatchford v. Native Village of Noatak, 501 U.S. 775, 779-82, 111 S.Ct. 2578, 2580-83, 115 L.Ed.2d 686 (1992). However, there are two well-established exceptions to the Eleventh Amendment's protections: Congress may abrogate the Eleventh Amendment without the consent of the states when acting pursuant to section 5 of the Fourteenth Amendment, or a state may waive its immunity by consenting to suit in federal court. Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238, 105 S.Ct. 3142, 3145, 87 L.Ed.2d 171 (1985). Here, the State waived its Eleventh Amendment immunity in the Compacts.
 
 
 28
 "[A] State will be deemed to have waived its immunity 'only where stated by the most express language or by such overwhelming implication from the text as will leave no room for any other reasonable construction.' " Atascadero, 473 U.S. at 239-40, 105 S.Ct. at 3146 (quoting Edelman v. Jordan, 415 U.S. 651, 673, 94 S.Ct. 1347, 1361, 39 L.Ed.2d 662 (1974) (internal quotations and alterations omitted)).
 
 
 29
 In Paragraph 19, the State expressly agreed that the Bands "shall seek a declaratory judgment against the State from a United States District Court of competent jurisdiction as to whether the deduction and distribution of the state license fee ... are permissible under the Act." Moreover, in Paragraph 19, the State not only consented to the suit, but it also agreed to the remedy.
 
 
 30
 Further, the State's waiver of its immunity to suit in federal court is not limited to the declaratory judgment action specified in Paragraph 19, but rather extends to all actions under the Compact. The parties agreed to the following Compact provision: "Judicial review of any action taken by either party under this Compact, or seeking any interpretation of this Compact, shall be had solely in the appropriate United States District Court...." By agreeing to judicial review by the district court of all actions under the Compacts and of any interpretation of the Compacts, the State consented to be subject to suit in federal court for the enforcement of Paragraph 19(B)(3). See Port Authority Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990) (general consent-to-suit provision coupled with statutory venue provision clearly indicate that states waived Eleventh Amendment immunity).
 
 
 31
 B. Paragraph 19 and the Intent of the Parties
 
 
 32
 The State now claims it never intended to surrender the license fees it collected from the racing industry to the Bands. It contends that, instead, it agreed in Paragraph 19(B)(3) to pay the license fees to the Bands only if the court determined that these fees constituted a tax on the Bands themselves and not on the racing associations. The State wishes to introduce extrinsic evidence which it believes will support this interpretation. We reject the State's proffered construction of Paragraph 19 as contrary to its plain and unambiguous language and reject the State's efforts to introduce extrinsic evidence.
 
 
 33
 In asking us to examine extrinsic evidence as to the meaning of Paragraph 19, the State attempts to escape the natural consequences of our Cabazon II decision. The State first contends that we answered a question which the Compacts did not contemplate presenting to the federal courts-whether the fees are impermissible even if they are not a tax on the Bands. However, the question framed in the Compacts was broad: "whether the deduction and distribution of the state license fee under [California law] are permissible under the Act." As the district court observed, "There is no limitation in the language of the compacts suggesting that the Bands could seek only a determination of whether the licensing fee [was] a tax on the Bands." 7/12/95 order at 14. In Cabazon II, we reached a result contemplated by the parties: that the fees are impermissible under IGRA. Thus, the district court properly rejected the State's argument: "The State cannot now be heard to claim that it did not foresee that it would lose the litigation or that the Ninth Circuit would reason in the way that it did." 7/12/95 order at 15.
 
 
 34
 The State next claims that we did not adjudicate the rights and obligations of the parties under Paragraph 19(B)(3) in Cabazon II, and thus that question remains open. Again, the State is mistaken. Although we agreed that "the license fee imposed falls directly upon the racing association, and not the Bands," 37 F.3d at 434, we concluded that "the Bands bear the actual burden of the license fee." Id. We reasoned:
 
 
 35
 Under the Cabazon and Sycuan Compacts, if the Bands prevail in this litigation, the State is required to pay them the amount of the license fee that the State receives from the racing associations based on wagers at Indian facilities. If the Bands lose, however, they will be deprived of this amount, which will go to the State. Contrary to the conclusion of the district court, the Bands do indeed have a "right" to the unpaid fees.
 
 
 36
 Id. Moreover, we made clear that the Compact terms, not state law, govern the resolution of this dispute. Id.
 
 
 37
 Regardless of whether we fully adjudicated the rights and obligations of the parties under Paragraph 19 in Cabazon II or whether that issue is before us to address anew, we see no need for extrinsic evidence to illuminate the meaning of Paragraph 19. We will not entertain strained interpretations of a clear and unambiguous compact provision. Instead, we hold the State to its word.
 
 
 38
 The State repeats its insistence that the phrase "impermissible under the Act" is ambiguous, and that the State intended that phrase to mean only that they were impermissible as a tax on the Bands in violation of 25 U.S.C. § 2710(d)(4). As noted above, the plain language of the Compacts does not contain such a restriction. The State further contends that, in Paragraph 19(B)(3), it agreed only to return to the Bands any taxes that it had imposed on the Bands. It did not agree to surrender to the Bands taxes collected from the racing industry. Once again, however, Paragraph 19(b)(3) is not subject to such a limited interpretation. Paragraph 19(B)(3) contains an unambiguous agreement that, if the license fees are impermissible, the State will pay to the Bands amounts equal to the past license fees already distributed to the State as well as amounts equal to the future license fees it collected. The Compacts do not provide for different remedies should the court determine the fees are impermissible because they are an indirect economic burden on the Bands as opposed to a tax. We simply cannot agree that there is any possible restrictive meaning of Paragraph 19(B)(2) and (B)(3). Thus, we reject the State's offer of extrinsic evidence.
 
 C. Primary Beneficiaries
 
 39
 Citing our Cabazon II decision, the State asks us to declare the Compacts invalid and unenforceable under IGRA because the racing associations and horsemen receive more revenue from the simulcast wagering than the Bands receive. Reasoning that we drew no distinction between the State and other persons who benefit from class III gaming on tribal lands, the State contends that the Bands are not the primary beneficiaries and thus that the Compacts are invalid.
 
 
 40
 The State misconstrues our analysis in Cabazon II. We did not erect an absolute bar to any Tribal-State compact under which any entity received more revenues from tribal gaming than the tribes. The primary beneficiary analysis in which we engaged extends no further than our consideration of whether IGRA preempts the State's regulatory scheme as to the disputed license fees. Recognizing that "[s]tate jurisdiction is pre-empted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority," we analyzed the federal, tribal, and state interests in the State's collection of the license fees. Cabazon II, 37 F.3d at 433. In that context, we observed that the federal interest in ensuring that the Bands are the primary beneficiaries of the gaming operations was threatened by the State's collection of the license fees. Id. However, our analysis did not end there. In order to resolve whether the license fees were impermissible, we considered both the Bands' interests and the State's interests. Id. at 434-35.
 
 
 41
 We are not convinced that, in this instance, a balancing of the competing federal, tribal, and state interests is required. IGRA "authorizes tribal governments and State governments to enter into tribal-State compacts to address regulatory and jurisdictional issues." S.Rep. No. 100-446, at 3 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3073. Here, the State and the Bands agreed to the application of the state wager distribution system, whereas they did not agree to the imposition of the State licensing fee scheme.
 
 
 42
 Even if we were to apply the same competing interests analysis utilized in Cabazon II, and even if the federal interest in ensuring that the Bands are the primary beneficiaries of the gaming operations would be threatened by the wager distribution formula because the racing associations and horsemen receive greater percentages, our examination could not end there. Again, we would have to balance the Bands' interests and the State's interests. The wager distribution formula does not economically burden the Bands in the same manner as the license fees, because the Compacts do not provide an alternative distribution scheme under which the Bands are entitled to the percentages of the wagers due to the horsemen and racing associations under California law. Moreover, the State has a strong interest in maintaining the wager distribution formula. While the Compacts provided for the reimbursement to the State of regulatory costs and thus satisfied the State's interest without imposition of the license fee, Cabazon II, 37 F.3d at 435, there is no alternative provision which would compensate the horsemen and the racing associations for providing the services upon which the success of the tribal gaming facilities-and the California horse racing industry-depend. Thus, under Cabazon II 's primary beneficiary analysis, IGRA does not preempt the extension of the state wagering distribution formula to the tribal gaming facilities with the Bands' consent, even though the racing associations and the horsemen receive greater revenues from the Bands' simulcast wagering facilities than the Bands receive.
 
 D. Illegal Slot Machines
 
 43
 Alleging that the Bands are conducting illegal gaming which is not authorized by the Compacts, the State asks us to enjoin the gaming as well as to declare the Compacts unenforceable, excusing the State from performance under Paragraph 19. The State alleges that the Bands are operating large-scale class III gaming operations and are offering banked and percentage games, including slot machines. Such gaming activities are not the subject of a Tribal-State compact. The State, however, has no jurisdiction over gaming activities that are not the subject of a Tribal-State compact.
 
 
 44
 IGRA limits the state's regulatory authority to that expressly agreed upon in a compact. Outside the express provisions of a compact, the enforcement of IGRA's prohibitions on class III gaming remains the exclusive province of the federal government. In Sycuan Band of Mission Indians v. Roache, 54 F.3d 535, 538 (9th Cir.1995), we held that the State lacked jurisdiction to enforce its criminal laws against class III gaming activities on tribal lands unless the tribe has consented to the transfer to the State of criminal jurisdiction pursuant to a Tribal-State compact.
 
 
 45
 The State seeks to avoid the teachings of Roache by arguing that the Bands did consent to state regulation of the gaming at issue here by entering into the Compacts. Because the Compacts authorized only simulcast horse racing, the State reasons, the banked and percentage games are being conducted in violation of the Compacts. To reach this conclusion, the State argues that an implied promise not to engage in other class III gaming should be read into the Compacts, because class III gaming not authorized by a compact violates IGRA. It then asserts that 25 U.S.C. § 2710(d)(7)(A)(ii) authorizes it to seek an injunction. Section 2710(d)(7)(A)(ii) provides federal jurisdiction over "any cause of action initiated by a State ... to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact...."
 
 
 46
 The State, however, seeks to extend its regulatory authority beyond what is authorized by IGRA. As the district court noted, "the State would use the compacts as leverage from which to extend its regulatory control to other class III gaming not covered by the compacts." 4/26/96 order at 6. We decline to conclude that the Bands have impliedly consented to the extension of state regulatory authority to their tribal lands, beyond the express provisions of the Compacts, simply by entering into the Compacts.
 
 
 47
 To understand the states' limited regulatory authority, it is important to remember that, traditionally, Indian tribes were immune from state criminal and regulatory jurisdiction except to the extent that they consented to be governed by it. In extending state jurisdiction to Indian lands in IGRA, Congress was careful to balance the need for state enforcement of gaming laws with the federal and tribal interests in traditional tribal sovereignty. S.Rep. No. 100-446, at 5, 1988 U.S.C.C.A.N. at 3075. To preserve the long-established principle that the jurisdiction of the state and the application of state law do not extend to Indian lands absent the consent of the tribes, id., tribal consent was a key component of IGRA. The Senate Committee on Indian Affairs explained in its statement of policy accompanying IGRA:
 
 
 48
 Consistent with these principles, the Committee has developed a framework for the regulation of gaming activities on Indian lands which provides that in the exercise of its sovereign rights, unless a tribe affirmatively elects to have State laws and State jurisdiction extend to tribal lands, the Congress will not unilaterally impose or allow State jurisdiction on Indian lands for the regulation of Indian gaming activities.
 
 
 49
 The mechanism for facilitating the unusual relationship in which a tribe might affirmatively seek the extension of State jurisdiction and the application of state laws to activities conducted on Indian land is a tribal-State compact. In no instance, does S.555 contemplate the extension of State jurisdiction or the application of State laws for any other purpose. Further, it is the Committee's intention that to the extent tribal governments elect to relinquish rights in a tribal-State compact that they might have otherwise reserved, the relinquishment of such rights ... shall not be construed ... as a general abrogation of other reserved rights or of tribal sovereignty.
 
 
 50
 Id. at 5-6, 1988 U.S.C.C.A.N. at 3075-76.
 
 
 51
 The State contends that the district court makes a mockery of the tribal-state compacting process by requiring the State to exact express promises not to engage in unauthorized gaming activities. We disagree. IGRA simply does not contemplate that a State will obtain unlimited regulatory authority over tribal gaming by entering a limited Tribal-State Compact. As the district court recognized:
 
 
 52
 To infer a general covenant in the compacts by the tribes not to engage in gaming in violation of state law and IGRA, would be tantamount to finding a cession by the tribes of general regulatory authority to the State over class III Indian gaming in which the State's enforcement tool would be its threat to void or breach the compact. The text of IGRA, its legislative history and the historical context in which it was passed, all point to the opposite conclusion: that state authority over class III gaming reaches no further than the explicit terms of the tribal-state compacts.
 
 
 53
 4/26/96 order at 11. The Bands have not consented to state regulation of gaming activities other than that expressly covered in the Compacts. Because the slot machines and other banked and percentage games are not mentioned in the Compacts, the Bands have not breached the Compacts. Further, under IGRA, the State has no jurisdiction to enjoin those gaming activities.
 
 
 54
 V. Intervention of SCOTWINC and the Racing Associations
 
 
 55
 On July 11, 1996, SCOTWINC, Del Mar Thoroughbred Club, Hollywood Park, Inc., Los Angeles Turf Club, Oak Tree Racing Association, Los Alamitos Race Course, and the Los Angeles County Fair moved to intervene as defendants. SCOTWINC is an organization formed by the race track operators pursuant to California Business and Professions Code section 19608.2 to operate the satellite transmission system as well as the system for including amounts bet at offtrack wagering facilities in the pari-mutuel pools. The remaining Applicants are racetracks who conduct live horse races and who transmit a signal of the races to satellite wagering facilities.
 
 
 56
 We review de novo a district court's ruling on a motion to intervene as of right. Forest Conservation Council v. United States Forest Serv., 66 F.3d 1489, 1493 (9th Cir.1995). However, we review for an abuse of discretion whether such an application to intervene was untimely. Id.
 
 
 57
 We have set out a four-part test for intervention pursuant to Rule 24(a)(2): "(1) the motion must be timely; (2) the applicant must claim a 'significantly protectable' interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the parties to the action." Id. This test is interpreted broadly in favor of intervention.
 
 
 58
 The district court denied the Applicants' motion to intervene as untimely: "This motion comes very late in these proceedings and long after proposed intervenors should have known about any interest they may have in the outcome of this litigation." 7/11/96 order at 1-2. We have outlined three criteria for determining whether a motion to intervene is timely: "(1) the stage of the proceedings; (2) whether the parties would be prejudiced; (3) the reason for any delay in moving to intervene." Northwest Forest Resource Council v. Glickman, 82 F.3d 825, 836 (9th Cir.1996).
 
 
 59
 We do not reach the question of whether the Applicants have a sufficiently strong interest to justify intervention.[3] However, to determine whether their motion was timely, we must determine when their claimed interest was implicated. We believe that the interest they now assert was apparent early in this litigation. The Applicants explain that they had no interest in the litigation presented in Cabazon I and Cabazon II, because at that stage, they understood the question presented to be only whether the fees are impermissible as a tax on the Bands. However, from the inception of this litigation, it was clear that the license fees at issue in this case are paid by the racing associations. Moreover, under the terms of the Compacts, of which the Applicants were aware, it is clear that the State and the Bands agreed that the State would continue to collect the fees from the racing associations, regardless of whether the court found them permissible under IGRA. Paragraph 19(B)(2) and 19(B)(3) clearly contemplate that either the State or the Bands would receive those fees.
 
 
 60
 Assuming arguendo that the Applicants had no immediate interest in the original litigation, surely they should have known what was in the offing after our October 1, 1994 decision in Cabazon II and after the district court, on July 12, 1995, ordered the Bands to file a new complaint to enforce Paragraph 19(B)(3). The Applicants must have been aware that the case might result in the State's continuing to collect money from them and then paying those revenues to the Bands. Nonetheless, the Applicants waited and watched. Instead of moving to intervene, they chose to rely on the State to protect their interests. In its November 21, 1995 answer, the State asserted that the Bands had failed to join indispensable parties-the racing associations. The district court, however, granted the Bands' motion to strike this affirmative defense on April 26, 1996, noting that "there is no indication that the racing association and horsemen have claimed any interest in this litigation, despite having had many years to do so." 4/26/96 order at 14. In that same order, the district court ordered the State to pay the Bands. Thus, by the time the Applicants moved to intervene on July 3, 1996, the district court had already directed the State to pay the fees to the Bands, effectively resolving the dispute. Even if the court had granted the intervention, the Applicants would only have been able to participate in the motion for reconsideration.
 
 
 61
 Having made the strategic decision to rely on the State to advance their interests, the Applicants opted to delay moving to intervene in this litigation until long after they should have realized not only that their asserted interest was at stake, but also that their interest had diverged from the State's. They must now live with the ramifications of their delay. They waited too long, and their application for intervention was untimely. The district court's decision to block intervention that late in the litigation was not an abuse of discretion.
 
 VI. Conclusion
 
 62
 The State and the Bands entered into Tribal-Compacts in which they agreed to submit the question of whether the license fees collected pursuant to California Horse-Racing Law are permissible under IGRA. Because the resolution of this dispute was essential to the completion of the Compacts, the parties also agreed to what would happen after the district court's decision. If the district court held that the fees are impermissible, the State would pay over to the Bands those fees, past and future. That contingency has occurred, and we hold the State to its agreement in the Compacts.
 
 
 63
 AFFIRMED.
 
 WIGGINS, Circuit Judge, dissenting:
 
 64
 I respectfully dissent. I am unable to join the majority opinion because I am not convinced that we have jurisdiction of the Bands' efforts to enforce the terms of their Tribal-State compacts.
 
 
 65
 "Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377, 114 S.Ct. 1673, 1675, 128 L.Ed.2d 391 (1994) (citations omitted). Neither the Constitution nor any federal statute confers the federal courts with jurisdiction of the Bands' efforts to enforce Paragraph 19 of their compacts with the State of California. As a result, I would vacate the district court's judgment and remand with instructions to enter judgment in favor of the Bands on the issue presented by their original complaint.
 
 
 66
 The majority finds federal jurisdiction of the Bands' efforts to enforce the terms of the compacts pursuant to 28 U.S.C. §§ 1331 and 1362, which each confer federal jurisdiction of claims "arising under" the laws of the United States. Following the reasoning adopted by the district court, the majority concludes that such jurisdiction is "necessarily confer[red]" by the Indian Gaming Regulatory Act of 1988 ("IGRA"), 25 U.S.C. §§ 2701-21. However, as the majority implicitly recognizes, IGRA does not contain a provision which expressly grants federal jurisdiction of a dispute arising under a Tribal-State compact. Instead, the majority concludes that IGRA created federal jurisdiction over the Bands' claims because otherwise a state could make "empty promises" and the Bands would be unable to enforce the terms of the agreement in federal court.
 
 
 67
 When this lawsuit was originally filed in district court, it presented an issue that was unquestionably within the jurisdiction of the federal courts. After our remand, however, the issues presented by this case transformed into something altogether different. No longer was the question whether the State's license fee was permissible under federal law; rather, the district court was asked to determine what rights the parties had under the terms of their Tribal-State compacts and to enforce those rights. As I understand the issues, IGRA is wholly irrelevant to this latter dispute. While IGRA created the Tribal-State compacting process, it does nothing to determine the compact-related rights and obligations of the Bands and the State. The answers to these questions necessarily lie in the language of the compact itself.
 
 
 68
 In fact, it was the language of the compacts which led to our decision in Cabazon Band of Mission Indians v. Wilson, 37 F.3d 430 (9th Cir.1994) ("Cabazon II "), where we held that IGRA preempts the State from collecting its customary license fee on wagers placed at the Bands' offtrack betting facilities. My reading of that opinion convinces me that the State and the Bands could have formulated a Tribal-State compact which would have allowed the State to collect its license fee. Our analysis in Cabazon II relies heavily on Paragraph 19 of the Bands' compacts with the State to reach the conclusion that IGRA preempts the State from imposing its license fees on the Bands. See id. at 434. A compact without such a provision may not have created the preemption problem which led us to hold that the State could not collect its customary license fee. The fact that the compact contains this provision does not mean that the Bands' present efforts to enforce the compacts arise under federal law.
 
 
 69
 The principal authority the majority cites in its jurisdictional analysis is abstract language from a footnote in the Supreme Court's decision in Merrell Dow Pharm. Inc. v. Thompson, 478 U.S. 804, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986). I do not find this authority persuasive for two reasons. First, Merrell Dow dealt with a far different jurisdictional problem than the one presented by the present case. There, the plaintiffs alleged that the defendant's misbranding of a drug in violation of the Federal Food, Drug, and Cosmetic Act ("FDCA") established a rebuttable presumption of negligence in their state law product liability action. The defendant attempted to remove the action to federal court, asserting that the plaintiffs' reliance on the defendant's violation of the FDCA created federal jurisdiction. The Supreme Court, holding that the district court did not have removal jurisdiction, found that the lack of a private right of action under the FDCA was dispositive as to whether the plaintiff's negligence arose under federal law. Id. at 817, 106 S.Ct. at 3236-37.
 
 
 70
 Our case is quite different. We must decide whether we have jurisdiction of a dispute about an agreement executed pursuant to a federal law (IGRA) that authorized two sovereigns (a state and an Indian tribe) to enter into such an agreement. As a result, I can't see how the core of Merrell Dow 's analysis is germane to our resolution of this issue.
 
 
 71
 Second, although I recognize that footnote 12 of the Merrell Dow decision contains language which suggests that an evaluation of the "nature of the federal interest" is at the heart of determining whether there is federal question jurisdiction, I do not believe the majority performs this evaluation correctly. The majority, at least in my view, is rather terse when it reaches the conclusion that the nature of the federal interest in this case is substantial enough to warrant concluding that IGRA confers jurisdiction of the Bands' compact enforcement claims to the federal courts. What is the federal interest in these claims? That the Bands would be unable to enforce the terms of the compacts? If so, what inference do we draw from the fact that Congress did not expressly provide for federal court jurisdiction of such a claim?
 
 
 72
 Thus, I turn to the core of the opinion's jurisdictional analysis: "We agree that Congress, in passing IGRA, did not create a mechanism whereby states can make empty promises to Indian tribes during good-faith negotiations of Tribal-State compacts, knowing that they may repudiate them with immunity whenever it serves their purpose." Opinion at 11043. I think that this argument-that Congress must have meant to create federal court jurisdiction of these claims-is flawed.
 
 
 73
 IGRA expressly confers federal jurisdiction of the following: (1) any cause of action initiated by an Indian tribe that the state refuses to enter into good faith negotiations for the purpose of entering into a Tribal-State compact; (2) any cause of action initiated by a state or Indian tribe to enjoin Class III gaming located on Indian lands and conducted in violation of a Tribal-State compact; and (3) any cause of action initiated by the Secretary of the Interior to enforce the mediation procedures which go into effect if an Indian tribe and a state are unable to complete a compact. 25 U.S.C. § 2710(d)(7)(A)(i)-(iii).
 
 
 74
 Obviously, the Bands' efforts to enforce the terms of their compacts with the State does not fit any of these three categories. Congress's jurisdictional grant was both quite specific and quite narrow. Even though it granted federal jurisdiction of disputes arising during the compact negotiation process, Congress expressly chose not to confer federal jurisdiction of compact enforcement claims. The majority's conclusion that we have jurisdiction of the Bands' efforts to enforce the compacts ignores this undisputable indication of Congressional intent. In so doing, the majority ignores the possibility that Congress may have wilfully left jurisdiction of these claims to another forum.
 
 
 75
 In sum, I am not convinced by the district court's "IGRA is not so vacuous" argument. I think it is just as likely that Congress deliberately left jurisdiction of compact-related claims to the tribal and state court systems. Both the tribal and state court systems would have jurisdiction of an action to enforce the terms of the tribal-state agreements.[1] Given IGRA's silence, I think the holdings of the Supreme Court (Merrell Dow included) require us to conclude that there is no federal question jurisdiction of the Bands' claims.
 
 
 76
 Similarly, I am not convinced by the majority's effort to distinguish Gila River Indian Community v. Henningson, Durham & Richardson, 626 F.2d 708 (9th Cir.1980). The majority subtly attempts to narrow Gila River 's holding by suggesting that it is limited to "run-of-the-mill" contract claims brought by Indian tribes. I cannot agree because I think Gila River is almost directly on point.
 
 
 77
 In Gila River, we held that the district court lacked jurisdiction of an Indian tribe's lawsuit against an architectural firm and building contractor for the alleged negligent design and construction of a youth center. The Indian tribe argued that federal common law should govern all Indian contracts, pointing out that federal statutes already regulated certain Indian contracts. We rejected this argument:
 
 
 78
 We see no reason why commercial agreements between tribes and private citizens cannot be adequately protected by well-developed state contract laws. Nor has the tribe pointed out why national uniformity of rules governing these transactions would be desirable. Adoption of state law in such cases does not present a conflict with the federal policy or interest in protection of Indian tribes. Nor has any other court perceived the need for federal common law rules governing contract disputes between Indian tribes and non-Indians. The absence of the United States as a party to the litigation is also a factor in determining the need for a federal common law rule.
 
 
 79
 Id. at 715 (citations omitted).
 
 
 80
 By its decision today, the majority does violence to the spirit of this decision. Gila River established that just because an Indian contract must meet with certain requirements set forth in a federal statute does not mean that the federal courts have jurisdiction of any dispute arising under that contract. We noted in Gila River that the Indian tribe did not seek recovery for damage to their land, but rather sought "recovery of damages for failure to perform a construction contract." Id. at 714. Similarly, the Bands seek recovery for breach of the Tribal-State compacts, not violation of IGRA or any other federal law. Although IGRA regulates the formation of Tribal-State compacts to a certain degree, I see no reason for the federal courts to become the arbiter of any and all disputes that may arise out of such a compact.
 
 
 81
 The majority also suggests that jurisdiction of the Bands' compact enforcement claims can be found in § 2710(d)(3)(C)(v), which provides authorization for Tribal-State compacts to provide remedies for breach of contract. This provision, however, says nothing about federal court jurisdiction of these breach of contract claims. Although the majority is correct that the parties could agree to waive their respective immunities, a long line of authority establishes that federal jurisdiction may not be conferred by such an agreement if it does not independently exist. See, e.g., Morongo Band of Mission Indians v. California State Bd. of Equalization, 858 F.2d 1376, 1380 (9th Cir.1988) ("The parties have no power to confer jurisdiction on the district court by agreement or consent."); see also E. Chemerinksy, Federal Jurisdiction § 5.1, at 249 (2d ed. 1994) ("[F]ederal court jurisdiction cannot be gained by consent of the parties.").
 
 
 82
 Finally, as an alternative basis for jurisdiction, the majority asserts we have jurisdiction because the Bands are seeking to recover money taken by the State in violation of federal law. I cannot agree. As I view it, the Bands seek nothing more than the enforcement of their Tribal-State compacts. Paragraph 19 of the compacts calls for the State to pay the Bands the disputed license fees as a result of our decision in Cabazon II, where we held that the State's license fees were preempted by federal law. Despite the fact that our resolution of that question was based on federal law, the Bands' efforts to obtain a judgment ordering the State to pay over the disputed license fees do not "arise under" the laws of the United States. Instead, they rely only on the terms of their Tribal-State compacts.
 
 
 83
 We federal judges must jealously protect our increasingly limited resources by ensuring that we adjudicate only those matters that we are authorized to hear by Congress and the Constitution. Here, we unquestionably had federal question jurisdiction of the legal issue presented in the Bands' original complaint, viz., whether the State's license fee on off-track betting was permissible under IGRA. However, when the district court failed to execute our instructions "to enter summary judgment for the Bands," Cabazon II, 37 F.3d at 435, this case began to present new and different issues of which we do not have jurisdiction. As a result, I respectfully dissent from the majority's decision to affirm the district court's order directing the State to pay the Bands' accumulated and future license fees.
 
 
 
 [1]
 The language of the Cabazon and the Sycuan Compacts concerning resolution of the license fee dispute is virtually identical
 
 
 [2]
 Notably, if the federal courts lack jurisdiction to enforce Tribal-State compacts, then both tribes and states may be left with no forum in which to enforce compacts, given the sovereign immunity of each
 
 
 [3]
 Whether they have such an interest is questionable. As the district court observed in reviewing the State's affirmative defense of failure to join the associations as indispensable parties: "The State argues that taxing the racing association and horsemen and paying those monies to the tribes may violate state law. Even if it does, however, the State's contractual obligation to the tribes will remain, and the racing association and horsemen will be free to purse any grievance they may have against the State in a separate action if they so choose." 4/26/96 order at 15
 
 
 [1]
 A well-drafted Tribal-State compact could contain the necessary waivers of sovereign immunity to provide a forum in which the compacts could be enforced. Here, of course, the Bands could bring an action in a California Superior Court to enforce the terms of their agreement with the state. By doing so, of course, they would be waiving any claim of sovereign immunity