**UNITED STATES of America, Plaintiff,**

v.

**SANTA YNEZ BAND OF CHUMASH MISSION INDIANS OF THE SANTA YNEZ RESERVATION, et al., Defendants.**

No. CV 97–1716 JSL.

United States District Court,
C.D. California.

Nov. 4, 1997.

Eliot F. Krieger, Asst. U.S. Atty., Los Angeles, CA, for Plaintiff.

Glenn M. Feldman, O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, Phoenix, AZ, for Defendants Santa Ynez Band of Chumash Mission Indians, Cabazon Band of Cahuilla Mission Indians, etc.

Art Bunce, Law Offices of Art Bunce, Escondido, CA, for Defendants Agua Caliente Band of Cahuilla Indians, etc.

Eugene R. Madrigal, Temecula, CA, for Defendants Cahuilla Band Mission Indians, etc.

George Forman, Forman & Prochaska, Sam Rafael, CA, for Morongo Band of Cahuilla Mission Indians etc. and Soboba Band of Luiseno Mission Indians, etc.

Jerome L. Levine, Levine and Associates, Los Angeles, CA, for Pechanga Band of Luiseno Mission Indians, etc. and San Manuel Band of Serrano Mission Indians, etc.

William S. Davis, Arter & Hadden, Los Angeles, CA, for Twenty–Nine Palms Band of Luiseno Mission Indians, etc.

## OPINION AND ORDER RE: MOTION FOR PRELIMINARY INJUNCTION,

LETTS, District Judge.

The United States has brought this civil action seeking injunctive relief against nine defendant Indian tribes.* The tribes are alleged to operate gambling machines and engage in other forms of gambling which are illegal under 25 U.S.C. §§ 2701–2721 (the Indian Gaming Regulatory Act ("IGRA")), 18 U.S.C. § 1166(a) (" § 1166"), and 15 U.S.C. § 1175 (the "Johnson Act").

IGRA and § 1166 were passed together as Public Law 100–497 in 1988. Because they serve distinct purposes, however, in this opinion they are defined separately as IGRA and § 1166. Public Law 100–497, comprising both IGRA and § 1166, is an integrated statutory scheme (the "IGRA scheme").

After the parties submitted briefs directed to the merits of plaintiff's motion for a preliminary injunction, the court requested supplemental briefing on the question whether the United States is the proper party plaintiff to bring this action. Having reviewed and considered the briefs, and the arguments made therein, the court reached the conclusion that the United States was not the proper party to bring this action, and substantially completed the opinion that follows.

Thereafter, the Ninth Circuit opinion in *Cabazon Band of Mission Indians v. Wilson,* 124 F.3d 1050 (9th Cir.1997) ("*Wilson*") came to the court's attention. This case, decided after the briefing, was not brought to the court's attention by any party. In the inter-

---

* This opinion is being published in conjunction with the court's decision on plaintiff's motions for summary judgment and to dismiss counter- claims and third party claims. These are being denied and granted respectively, for reasons given in this opinion.

ests of time the court did not ask for further briefing. After considerable deliberation, the court has concluded that this case is controlling as to key aspects of the previously drafted opinion, and requires a change in the previously contemplated holding. *Wilson* was decided on very different facts from those before the court, however, and its reasoning produces an anomalous result in this case. For this reason, the court is including in this opinion its pre-*Wilson* analysis, as originally drafted, so that it may be considered on appeal.

## I.

## PRE-*WILSON* ANALYSIS

The United States relies primarily on § 1166(a), which makes state gambling laws applicable in Indian country, as the basis of its authority to bring this action. It also asserts implied rights to bring this civil action stemming from the criminal provisions of § 1166(b) and the Johnson Act, based upon its contention that the civil remedy sought is necessary to effectuate the purposes of those statutes. The court need not reach questions concerning whether any right to proceed civilly should be implied from these criminal statutes. For purposes of this case, § 1166(a) does contemplate adequate civil remedies, together with other remedies contemplated by IGRA, to effectuate all of the relevant statutory purposes. The dispositive question to be decided here, therefore, is not *whether* § 1166(a) contemplates civil actions, but rather *by whom* such actions will be brought.

■ The tribes contend that IGRA grants exclusive civil enforcement power to the National Indian Gaming Commission ("NIGC"), and only it, if anyone, could bring a civil action based on § 1166(a). This contention is disposed of easily. IGRA does grant civil enforcement powers to the NIGC, including the power to impose civil fines and the power to close gaming facilities either temporarily or permanently. 25 U.S.C. § 2706(a). These powers, however, extend only to violations of "this chapter"—Chapter 29. "This chapter" does not include § 1166. Nothing in the IGRA scheme suggests that the NIGC is to be responsible for enforcing the state laws made applicable by § 1166(a). The tribes' position that the NIGC is the proper party to bring a civil lawsuit under § 1166(a), therefore, is unpersuasive in view of the language of IGRA.[2] It is also unpersuasive in view of the language of § 1166(a), which is discussed below.

The United States contends that it is vested with exclusive authority to bring civil lawsuits under § 1166(a), and advances a number of arguments to support its contentions. The United States also argues against the possibility that the State of California is vested with this authority under § 1166(a). The state is not a party to the action, and it has not sought to present its own position through special appearance.

Based upon the clear language of the statute, and an understanding of the IGRA scheme, the court concludes that the state, not the United States, is the proper party plaintiff in this action brought pursuant to § 1166.

### A. The IGRA Scheme

■ It is unnecessary to undertake a verbatim analysis of the entire IGRA scheme. It is necessary, however, to have a general understanding of IGRA, and of how IGRA and § 1166 fit together to comprise the overall IGRA scheme. IGRA establishes the regulatory framework within which all lawful Indian gaming is to be regulated. It divides various gambling activities into three categories (Class I, Class II and Class III) and provides different modes of regulation for each. Class III gaming is defined as "all forms of gaming that are not Class I or Class II gaming." 25 U.S.C. § 2703(8).

IGRA contemplates that Class III gaming will be subject to state regulation. It does not contemplate that this regulation will be

---

**2.** Defendants also argue that the United States must exhaust its remedies in the tribal court system before bringing this matter in federal court, and thus dismissal is required. *See Strate v. A–1 Contractors,* — U.S. —, — — —, 117 S.Ct. 1404, 1411–13, 137 L.Ed.2d 661 (1997); *Iowa Mutual Insurance Co. v. LaPlante,* 480 U.S. 9, 14–18, 107 S.Ct. 971, 976–77, 94 L.Ed.2d 10 (1987); *National Farmers Union Insurance Co. v. Crow Tribe,* 471 U.S. 845, 856–57, 105 S.Ct. 2447, 2454, 85 L.Ed.2d 818 (1985). In this case, however, the doctrine is meaningless, as tribal court jurisdiction is foreclosed by the sovereign immunity of the United States. *See United States v. Yakima Tribal Court,* 806 F.2d 853, 861 (9th Cir.1986); *United States v. White Mountain Apache Tribe,* 784 F.2d 917, 920 n. 10 (9th Cir. 1986).

imposed by unilateral state legislative or executive action. Instead, IGRA contemplates that regulation will be achieved through a participative process ultimately leading to tribal-state compacts agreed upon between states and tribes.

IGRA expressly provides that Indians will be entitled to engage in all forms of Class III gaming that are permitted to other citizens of the surrounding states, and requires the states to negotiate in good faith toward the execution of tribal-state compacts. 25 U.S.C. § 2710(d)(3)(A). IGRA does not require states, however, to negotiate tribal-state compacts that would permit Indians to engage in kinds of Class III gaming that are prohibited to other citizens of the states. After IGRA there are two kinds of gaming that fall outside of the IGRA regulatory ambit ("non-conforming gaming")—Class III gaming of kinds that are prohibited to all citizens, which IGRA does not require must ever become lawful, and Class III gaming that is not prohibited to other citizens, but is being conducted without the requisite tribal-state compact.

IGRA itself does not make non-conforming Indian gaming unlawful or describe how it will be prevented and/or punished. Subsections (a) *and* (b) of § 1166 fill this gap. Together these subsections allow for civil actions to prevent, and criminal actions to punish, acts of non-conforming gaming.

Before analyzing the words of § 1166 and addressing the contentions of the parties in detail, the court deems it useful to consider

the basic anomalies of the United States' position that it has the exclusive right to enjoin non-conforming gaming.

As to non-conforming gaming that is prohibited to all citizens, the state is not obligated to negotiate a tribal-state compact that would permit such gaming. As to activities within this category of non-conforming gaming which are conducted in the absence of a tribal-state compact, Indian tribes have no color of right. Absent some overriding consideration, therefore, it is difficult to see why Congress would strip the states of all power to stop this kind of non-conforming gaming everywhere in the state where it appears, and leave enforcement of state laws made applicable by § 1166(a) entirely to the discretion of individual U.S. Attorneys whose districts lie within the state.[3]

As to non-conforming gaming that IGRA obligates the states to permit pursuant to tribal-state compacts negotiated in good faith, the position of the United States is even more anomalous, particularly when it is considered in the context of an action for injunctive relief. Congress, in enacting IGRA, took the extraordinary step of expressly anticipating that states might refuse to negotiate in good faith, and providing a solution for that eventuality.[4] The solution involves a lengthy process by which a judicial determination is made that the state is not negotiating in good faith. Thereafter, an administrative process ensues, which results in the gaming becoming subject to federal regulation.[5]

---

**3.** Notably, within California, only the United States Attorney for the Central District has attempted to enjoin non-conforming Indian gaming pursuant to § 1166(a). Other districts in the state have announced publicly that they will stay enforcement of § 1166 pending tribal-state compact negotiations with the Pala Band of Mission Indians, which is expected to provide a model for all other tribal-state compacts. The United States Attorney here argues that it is entirely within her discretion to allocate resources as she chooses. The difficulty with her position is that it frustrates the operation of what Congress intended as a consistent federal scheme. Pursuant to the IGRA scheme, Class II gaming is regulated by IGRA and is uniform as to all Indians in the United States, regardless of the laws of a particular state. See 25 U.S.C. § 2706(b). Class III gaming, on the other hand, is regulated by agreement with the states and the states are to treat the Indians at least as favorably as it treats other

citizens of the state. If non-conforming Class III gaming is left to federal enforcement, which differs depending upon the federal district in which particular Indians reside, and if the United States Attorney's contention that she may enforce the laws without reference to what is happening elsewhere in the state is accepted, then the Indians would not be treated like other Indians of the state and the purpose of IGRA would be frustrated.

**4.** As passed, IGRA forced the tribal-state compacting process along by providing that tribes could sue states for refusing to enter into negotiations or failing to negotiate in good faith. 25 U.S.C. § 2710(d)(7)(a).

**5.** This part of the statute was determined to be unconstitutional in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

It is difficult to conclude that Congress intended that non-conforming gaming should be enjoined *solely* on the basis that there is no tribal-state compact without even considering the question of whether the state has negotiated toward a tribal-state compact in good faith.[6] To allow this to happen might be to reward the very conduct that Congress sought to prevent.

Adopting the position of the United States, however, would lead to this very result. In an action for an injunction brought by the state, the equitable question of *why* there is no tribal-state compact —whether the tribe was refusing to accept reasonable terms or the state was refusing to offer them—would be squarely raised, and likely would be dispositive. According to the United States, as it sees its own action, the question is not even relevant. However, the nature of the instant action illustrates perfectly why the states are the proper party plaintiff in a civil action brought to enjoin non-conforming gaming.[7] If the state had brought this action, the tribes would have been able to raise numerous defenses, if applicable, such as a failure to negotiate in good faith.[8] These defenses are not available against the United States.

The court now turns to § 1166 itself. The plain language and the structure of § 1166 further illustrate that the state, not the United States, is the proper party plaintiff.

## B. The Statute

Section 1166 reads as follows:

(a) Subject to subsection (c), for purposes of Federal law, all State laws pertaining to the licensing, regulation, or prohibition of gambling, including but not limited to criminal sanctions applicable thereto, *shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State.*

(b) Whoever in Indian country is guilty of any act or omission involving gambling, whether or not conducted or sanctioned by any Indian tribe, which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State in which the act or omission occurred, under the laws governing the licensing, regulation, or prohibition of gambling in force at the time of such act or omission, *shall be guilty of a like offense and subject to a like punishment.*

(c) For the purpose of this section, the term 'gambling' does not include—

(1) class I gaming or class II gaming regulated by the Indian Gaming Regulatory Act, or

(2) class III gaming conducted under a Tribal–State compact approved by the Secretary of the Interior under Section 11(d)(8) of the Indian Gaming Regulatory Act that is in effect.

---

**6.** It is not beyond reason that Congress might have considered the problem of unregulated gambling to be of such magnitude that it wanted all unregulated gambling discontinued at the behest of the United States until it was made subject to IGRA regulation. In light of the fact that IGRA was enacted in 1988, however, it is difficult for the United States to advance this contention.

**7.** The need to have the state as the party plaintiff in actions to enforce § 1166 is further illustrated by *Chemehuevi Indian Tribe v. Wilson*, C 97–1478 BZ (N.D.Cal.), a case pending in the Northern District of California. There, the Indians have sued the State of California in an attempt to force it to negotiate a tribal-state compact in good faith. Because of the bar to such suits imposed by *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the Indians are attempting to have the United States intervene on their behalf, arguing that the United States has a trust relationship with the Indians and is obligated to see that the purposes of IGRA are not frustrated. The United States Attorney for the Northern District has refused to intervene, at least partly because of the position that the United States Attorney for the Central District has taken in this case. If the state were to attempt to sue these Indians pursuant to § 1166, the Indians could defend such a suit by raising the state's alleged refusal to negotiate in good faith. If the United States were to bring such a suit, however, the Indians would have no such defense.

**8.** As set forth in Part III below, the court presently has little information regarding the status of the tribal-state negotiations with respect to the defendant tribes. It is unclear whether the tribes began conducting Class III gaming in the good faith expectation that tribal-state compacts would be reached on a timely basis or whether the tribes simply took advantage of a perceived regulatory vacuum prior to the signing of a tribal-state compact.

(d) The *United States shall have exclusive jurisdiction over criminal prosecutions* of violations of State gambling laws that are made applicable under this section to Indian country, unless an Indian tribe pursuant to a Tribal–State compact approved by the Secretary of the Interior under section 11(d)(8) of the Indian Gaming Regulatory Act, or under any other provision of Federal law, has consented to the transfer to the State of criminal jurisdiction with respect to gambling on the lands of the Indian tribe.

(Emphasis added.)

■ In determining Congress' intent, the starting point is the language and structure of the statute. Subsection (a) of § 1166 begins by making all gambling laws "apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the state." Subsection (b) separates out from the state gambling laws made to apply by § 1166(a) those laws which would be punishable under state law, and defines identical, independent federal offenses based on those laws. Subsection (c) exempts from both § 1166(a) and (b) all Indian gaming done in conformity with IGRA, thus leaving only non-conforming gaming subject to § 1166(a) and (b). Subsection (d) prevents states from bringing prosecutions for violations of laws made applicable by § 1166 in the absence of tribal consent given pursuant to a tribal-state compact.

■ Consideration of the structure of § 1166 suggests strongly that Congress intended to distinguish civil enforcement to prevent future acts of non-conforming gaming from criminal enforcement efforts to punish past acts. As to the latter, § 1166(b) and (d) leave no doubt that criminal enforcement is the exclusive province of the United States. *See Sycuan Band of Mission Indians v. Roache*, 54 F.3d 535, 540 (9th Cir. 1994). The United States contends that Congress also intended for it to have the same exclusive power to bring civil enforcement actions under § 1166(a). The statute says nothing at all to suggest this. On the contrary, the more natural inference to be drawn from Congress' decision to make state law applicable, as such, in § 1166(a), rather than to convert it to federal law as in § 1166(b), is that Congress intended to divide the enforcement of the two subsections between the states and the United States.

If Congress had not intended § 1166(a) to be used by the states for civil enforcement of the state laws made applicable by it, there was no need first to make all state gambling laws applicable, as such, and then to carve out only those acts which would be *punishable* under state law and redefine them as identical, independent federal offenses.

■ It is a "well-settled rule that a statute must, if possible, be construed in such fashion that every word has some operative effect." *U.S. v. Nordic Village Inc.*, 503 U.S. 30, 36, 112 S.Ct. 1011, 1015, 117 L.Ed.2d 181 (1992). If Congress had intended for the United States, rather than the states, to have civil enforcement power, there was no need for it to adopt the different means of relating state law to federal law reflected by § 1166(a) and (b).

Using federal law to make state law applicable, as is done in § 1166(a), differs from using state law as a means to define independent federal law, as is done in § 1166(b). The latter legislative approach precludes any possibility of state enforcement. The use of federal law to make state law applicable is an established Congressional method for allowing states to apply their laws in Indian country in a manner which does not abridge Indian sovereign rights. *See, e.g.,* 18 U.S.C. § 1162; *Bryan v. Itasca County*, 426 U.S. 373, 377–81, 96 S.Ct. 2102, 2106–07, 48 L.Ed.2d 710 (1976) (interpreting 18 U.S.C. § 1162).

■ Indian sovereignty "is dependent on, and subordinate to, only the Federal Government, not the states." *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 152–54, 100 S.Ct. 2069, 2081, 65 L.Ed.2d 10 (1980). "[S]tate laws may be applied to tribal Indians on their reservations only if Congress has expressly so provided." *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207, 107 S.Ct. 1083, 1087, 94 L.Ed.2d 244 (1987); *see also United States v. Farris*, 624 F.2d 890, 897 (9th Cir.1980) ("[Congress] can freely adopt state gambling laws expressly or by reference.").

In *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987), the Supreme Court sharply limited the power of states to apply their gambling laws to Indian gaming. An essential element of its decision was that Congress had not acted specifically to make state gambling laws applicable in Indian country. This decision made clear that it would require a new act of Congress for states to have any effective ability to prevent or regulate Indian gaming. IGRA was enacted in direct response to *Cabazon*. *See Confederated Tribes of Siletz Indians v. United States*, 110 F.3d 688, 692 (9th Cir. 1997); *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1548 n. 3 (10th Cir.1997).

Subsection (a) of § 1166 expressly makes state gambling laws applicable in Indian country. Its language appears to be purposely intended to remove the *Cabazon* bar to state enforcement of gambling laws. Examination of § 1166(d) buttresses this construction. Although this subsection on its face gives the United States "exclusive jurisdiction over criminal prosecutions of violations of State gambling laws that are made applicable by this section," there is no reason to believe that this jurisdiction would ever be exercised. Any federal prosecutions undoubtedly would be based on the identical independent offenses established by § 1166(b). The practical effect of this part of § 1166(d) is directed not to providing needed authority to the United States to bring prosecutions based on state law, but rather to making doubly clear that states could not rely on § 1166 as a basis for state criminal prosecutions.[9] For this reason, it forms no basis for concluding that Congress intended to use this provision to grant any civil authority to the United States. Conversely, clarification as to criminal prosecutions would have been completely unnecessary if Congress had not intended to grant *any* enforcement power to the states under § 1166(a).

Based upon the foregoing, the court concludes that the United States cannot look to § 1166 itself as authorizing it to bring this suit. The United States would be entitled to bring this suit only if it has advanced arguments outside the face of § 1166 sufficient to overcome the import of its language. Those arguments are now addressed.

## C. Indian Sovereignty

The United States' primary contention is that for the court to conclude that the State of California is the proper party to bring this action would significantly impinge upon tribal rights of sovereignty.

Prior to IGRA, almost all of the disputes between states and Indian tribes involved attempts by the state not to prohibit Indian gaming entirely, but rather to subject it to state regulation. *See, e.g., California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987). Congress, however, had subjected Indian gaming only to the provisions of a variety of federal criminal laws and a federal law which, to an extent, rendered state law applicable in Indian country. Although the latter conferred subject matter jurisdiction on state courts to hear civil disputes arising in Indian country, the Supreme Court held that this section did not subject reservation Indians to the enforcement of the state's civil laws. *Bryan v. Itasca County*, 426 U.S. 373, 386–90, 96 S.Ct. 2102, 2110–12, 48 L.Ed.2d 710 (1976). After *Bryan*, the states abandoned civil law as a means for accomplishing outside regulation.

As a result, pre-IGRA state efforts to subject Indian gaming to outside regulation were necessarily based on state laws that were criminal in nature. Attempted prosecution by one sovereign (the state) of another sovereign (the Indians) for acts done within the jurisdiction of the other sovereign (Indian country) raises obvious problems of sovereignty.

Criminal prosecution is a very blunt instrument when used indirectly to achieve some

---

**9.** The awkward wording of § 1166(d) has contributed to subsequent litigation over whether states may prosecute Indian violations of state gaming laws in state courts. Ninth Circuit cases have confirmed the court's construction, however, that § 1166(d) precludes all post-IGRA at-tempts by the states to prosecute non-conforming Indian gaming. *United States v. E.C. Investments, Inc.*, 77 F.3d 327, 330–331 (9th Cir.1995); *Sycuan Band of Mission Indians v. Roache*, 54 F.3d 535, 540 (9th Cir.1994).

other purpose. Punishment for past acts of Indian gaming neither produces gaming regulation nor prevents future gaming. Prior to IGRA, this instrument was used as a means to achieve the states' regulatory objectives because it was the only means available. Naturally, it provoked keen protests that the use of criminal laws in this manner represented an unlawful encroachment on tribal sovereign rights. Even in Cabazon, however, the Supreme Court acknowledged that, as to purely prohibitory laws, the states would have this power. *Cabazon,* 480 U.S. at 208–12, 107 S.Ct. at 1088–89. It then defined "prohibitory" so narrowly that there remained no basis for relying on such laws as a means for subjecting Indian gaming to outside regulation. *Id.*

Section 1166 addresses these concerns directly. Although it makes all state gambling laws, including those that may be criminal in nature, applicable in Indian country, it precludes any state criminal prosecutions thereunder. Moreover, neither § 1166 nor IGRA confers any jurisdiction on state courts.

By enacting § 1166, Congress impinged upon Indian sovereignty by no more than the initial act of making state gambling laws applicable in Indian country, which is clearly within Congress' power. *See California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 206–08, 107 S.Ct. 1083, 1087, 94 L.Ed.2d 244 (1987); *United States v. Farris,* 624 F.2d 890, 897 (9th Cir.1980). Beyond this, allowing states to enforce their gambling laws through civil litigation in federal courts has no bearing upon Indian sovereignty.

Deciding that the states, rather than the United States, have this power does not raise issues relating to Indian sovereignty, particularly in the context of civil actions. Unlike criminal law, civil law treats the litigants as equals. No matter who the parties are, neither party to a civil lawsuit has any different rights from the other with respect to how they prepare or present their cases. The burden of proof is as nearly equal as it is possible to make it. Indian sovereignty is not affected by whether the state or the United States is determined to be the proper plaintiff to sue to enforce these civil laws, because civil litigants are equal before the law.

Congress decided to make state gambling laws applicable in Indian country, and it was entitled to do so. Whatever impingement on Indian sovereignty may have been involved in this decision, it was complete with that decision.

### D.  Legislative History

The United States points to two passages in IGRA's legislative history in support of its position. The first is as follows:

> the Committee has developed a framework for the regulation of gaming activities on Indian lands which provides that in the exercise of sovereign rights, unless a tribe affirmatively elects to have State laws and State jurisdiction extend to tribal lands, the Congress will not unilaterally impose or allow State jurisdiction on Indian lands for the *regulation* of Indian gaming activities.

*Report to the Senate Indian Affairs Committee,* S.Rep. No. 446, 100th Cong.2d Sess., 13 (Aug. 13, 1988) (reprinted in 1988 U.S.C.C.A.N. 3075) (emphasis added)

The second passage from the legislative history on which the United States relies is quoted in the context of its brief:

> Absent a compact, all state laws regarding gambling are assimilated into federal law. 18 U.S.C. § 1166(a). "In no instance does S. 555 [IGRA] contemplate the extension of State Jurisdiction or the application of State laws for any other purpose."

United States' Supplemental Memorandum In Support of Motion for Preliminary Injunction at p. 4:6–11 (*quoting Report to the Senate Indian Affairs Committee,* 1988 U.S.C.C.A.N. at 3076).

With respect to the first quoted passage, it is indeed true that the IGRA regulatory framework does *not* impose or allow state laws or state jurisdiction in Indian lands for the regulation of Indian gaming activities without the affirmative election of affected tribes. However, § 1166(a) was also enacted, and it does make state laws applicable in Indian territory without the consent of Indian tribes. This does not conflict with the Committee Report, as § 1166(a) deals only with the prevention of Indian gaming activities conducted outside of the IGRA regulatory framework.

As it appears in the brief, the second passage quoted by the United States appears to suggest that the Committee represented that the only purpose for which state jurisdiction or state law was extended by § 1166(a) was to "assimilate it into the federal law." [10] The United States nowhere explains what it means by its use of the term "assimilate" in the context of the IGRA scheme. This is not a term like "incorporate" or "adopt," to which the court ascribes established legal meanings. The word is not used in the Committee Report. In fact, in the Committee Report, the two passages quoted by the United States would have been continuous, but for the exclusion of the following sentence, which appears between them in the Committee Report:

> The mechanism for facilitating the unusual relationship in which a tribe might affirmatively seek the extension of State jurisdiction and the application of state laws to activities conducted on Indian land is a tribal-State compact.

*Id.*

■ Taken as a whole, the entire passage suggests that the sole purpose of § 1166(a) is to facilitate tribal-state compacts—*not*, as the government seems to argue, to "assimilate" state law into federal law. Read in context, the entire passage suggests that § 1166(a) provides *no* basis for civil enforcement by anyone. It tends to refute rather than support the government's position.[11]

## II.

### POST-*WILSON* ANALYSIS

■ It is unnecessary to quote from or to engage in extensive analysis of the Ninth Circuit opinion in *Wilson* to describe its effect on the pre-*Wilson* analysis. In subpart D. of the *Wilson* opinion, the Ninth Circuit interprets the full passage from the Senate Committee Report quoted above [12] as it was to be interpreted by this court. *Cabazon Band of Mission Indians v. Wilson*, 124 F.3d

1050, 1058–61 (9th Cir.1997). The *Wilson* opinion, however, does not go on, as this court would have, to reject that construction as too narrow to reflect Congress' actual intent for all of the reasons given above.

The issue decided in *Wilson* was very different from the issue presented here. In *Wilson*, there existed tribal-state compacts which were already in effect. *Id.* 124 F.3d at 1053–54. The compacts did not specify that Class III gaming not expressly permitted by the compacts would be prohibited in accordance with state law. *Id.* at 1059–60. *Wilson* may be read, therefore, to stand for no more than the proposition that, if a tribe does agree to submit to state regulation through a tribal-state compact, the compact preempts the field and must specify not only what gaming is permitted, but also what is not. Such a construction would allow the court to reach the result initially intended. It is too strained, however, to be adopted at the trial level, and therefore must be rejected. `

Accordingly, the court must consider the matter further. For the reasons given in the court's discussion of § 1166,[13] the court holds that § 1166(a) does not contemplate civil enforcement by the United States. Prior to *Wilson*, the court intended to conclude that § 1166(a) did contemplate civil enforcement by the states. This was foreclosed by *Wilson*. Accordingly, for the reasons stated above regarding the bluntness of the instrument of criminal prosecution used for purposes of prevention,[14] and to effectuate the purposes of Public Law 100–497, the court concludes that it is necessary to infer the power of the United States to bring civil injunction actions to prevent non-conforming gaming.

## III.

### PRELIMINARY INJUNCTION

■ The foregoing holdings require the court to reach the merits of the case. To

---

**10.** The United States' argument that all state laws are made federal by § 1166(a) is particularly unconvincing in view of the different language used by Congress in § 1166(a) and (b). See the court's discussion of this issue in Part I.C. above.

**11.** The remainder of the court's pre-*Wilson* analysis is omitted.

**12.** *See supra* Part I.D.

**13.** *See supra* Part I.B.

**14.** *See supra* Part I.C.

prevail on the merits, the United States must show: (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are presented and the balance of hardships tips sharply in its favor. *Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League,* 634 F.2d 1197, 1201 (9th Cir.1980). The two formulations represent two points on a continuum in which the required degree of irreparable harm increases as the probability of success on the merits decreases. *Oakland Tribune, Inc. v. Chronicle Publishing Co.,* 762 F.2d 1374 (9th Cir.1985). Here, the public interest must be considered as part of the comparison of the balance of hardships. *See United States v. Odessa Union Warehouse Co-op,* 833 F.2d 172, 174 (9th Cir.1987).

Neither the United States nor the tribes has yet had an opportunity to present evidence as to the state of negotiations between the tribes and the State of California toward tribal-state compacts. The United States contests the need for such evidence to be presented. For the reasons given in the discussion of the anomalies of the government's position,[15] the court holds that a preliminary injunction cannot issue until the Indians have had an opportunity to present this evidence.

The balance of hardships tips sharply in favor of the tribes. The tribes assert that they are almost entirely dependent on gaming for their income and that most of their gaming revenues come from Class III gaming. The tribes claim that they have made substantial investments in Class III gaming, presumably in the expectation that tribal-state compacts would be reached on a timely basis.[16] A preliminary injunction, if issued, would produce considerable pressure on the tribes to capitulate to any terms offered by the state in tribal-state compact negotiations. Moreover, as evidenced by the substantial time that has already passed, continued Class III gaming by the tribes would not produce equal pressure upon the state or the United States.

The United States' interest *is* the public interest. The public interest in this case is to prevent Indian tribes from participating in Class III gaming that remains subject only to tribal regulation. The court views this as a *very* substantial public interest. For purposes of a preliminary injunction, however, the United States has given substantial definition to this interest by its own actions. There is evidence that the United States has known for years that Class III gaming is being conducted by the Indians and has allowed the gaming to continue and grow without ever attempting to shut it down. Moreover, in the other districts in California, the United States Attorneys have stated that they will stay enforcement against the Indians pending the finalization of a model tribal-state compact. If the public interest in shutting down Class III gaming were so great, one would expect all of the districts to be behaving the same way and bringing enforcement actions.

Finally, although there is a very substantial public interest in subjecting tribal Class III gaming to outside regulation, this interest is offset by the public interest in not imposing severe hardships on the Indian tribes and others who have based their livelihoods on Indian gaming before determining whether their cause is just.

## IV.

## CONCLUSION

Having reviewed the papers filed in connection with this matter, having heard oral argument, and being fully apprised of the relevant facts and law,

IT IS HEREBY ORDERED that plaintiff's motion for a preliminary injunction be DENIED.

IT IS SO ORDERED.

---

**15.** *See supra* Part I.A.

**16.** The United States has alleged that the tribes have significantly increased the number of Class III gaming machines within the last two years.

The court does not sympathize with the tribes' plight to the extent that they have increased their investment in Class III gaming *after* being put on notice that the United States planned to take action against them.